UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Sergio Francisco Puebla Palomo,

                              Plaintiff,

        -against-                                              5:15-CV-1536 (LEK/TWD)

Joseph G. DeMaio, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Sergio Francisco Palomo—a Mexican musician, composer, and recording artist—brought

this action against his former production company, Magic Circle Music,[1] and its owner, Joey

DeMaio. Until around July 2012, Plaintiff's band and DeMaio's band, HolyHell and Manowar

(respectively), worked together on various musical projects, including albums, live shows, and

tours. Defendants allege that around December 2011, HolyHell struck a deal with Magic Circle

to record an album called "Darkness Visible" at Magic Circle's studios. Magic Circle foot much

of the bill for producing and promoting the album and expected to share the profits. During a

summer 2012 tour, however, the bands had a falling-out, and Defendants began to suspect that

HolyHell would not deliver the album as promised. As security, Defendants detained Plaintiff's

_____

        [1] "Magic Circle" is in fact a collection of corporations—including Defendants Circle
Song Music, LLC, God of Thunder Productions, Ltd., Magic Circle Films International, LLC,
Magic Circle Guitars, LLC, and Magic Circle Music, Ltd.—all owned and operated by Joey
DeMaio. Dkt. Nos. 151-2 ("May 2018 DeMaio Affidavit") ¶ 1, 166-1 ("April 2018 DeMaio
Affidavit") ¶ 1. The parties do not make any distinctions among those entities that are relevant to
the Court's analysis of the summary judgment motions. Accordingly, it will refer to the corporate
defendants as "Magic Circle" throughout this opinion.

music equipment (with a total value of around $60,000) in a shipping container and refused to return it. Plaintiff alleges conversion, replevin, and tortious interference with his various other business relationships for which the equipment was needed. Defendants have counterclaimed for breach of the album contract and unjust enrichment.

After protracted litigation, both sides moved for summary judgment. Dkt. Nos. 151 ("Defendants' Motion for Summary Judgment"), 152 ("Plaintiff's Motion for Summary Judgment").[2] For the reasons that follow, the Court grants the Motions in part; the record compels a finding that Defendants converted Plaintiff's equipment (entitling him to replevin). In addition, Plaintiff's claim for tortious interference with prospective economic relations must be dismissed. However, there are genuine disputes of material fact concerning: the quantum of damages Plaintiff suffered from Defendants' conversion; whether Plaintiff breached any contracts with Magic Circle; and whether Plaintiff was unjustly enriched. Accordingly, the motions are otherwise denied.

## II.   LEGAL STANDARD

The Court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute over a material fact is "genuine" if there is enough evidence to permit a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, summary

---

[2] The motions are fully briefed. See Dkt. Nos. 151-1 ("Defendants' Statement of Material Facts"), 151-4 ("Defendants' Memorandum"), 153 ("Plaintiff's Statement of Material Facts"), 160 ("Plaintiff's Memorandum"), 165 ("Plaintiff's Opposition"), 166 ("Plaintiff's Response Statement of Material Facts"), 167 ("Defendants' Response Statement of Material Facts"), 167-3 ("Defendants' Opposition"), 168 ("Plaintiff's Reply"), 170 ("Defendants' Reply"). Except when citing transcripts and depositions, the Court will use the pagination generated by ECF.

judgment should be granted if and only if "no reasonable trier of fact could find in favor of the nonmoving party." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The movant bears the burden of identifying those portions of the record that demonstrate that the nonmovant has failed "to establish the existence of an element essential to [his] case." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To rebut this showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). He must set forth "specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. And he must support those facts with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court must nonetheless resolve all ambiguities and draw all reasonable inferences in favor of a trial. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Its duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## III. BACKGROUND

### A. Facts

The following facts are undisputed unless otherwise noted. The Court will provide more detail as necessary in its analysis.

From 2005 to April 2013, Plaintiff served as a music director and composer for Magic Circle. Defs.' SMF ¶ 3; Pl.'s RSMF ¶ 3. As Music Director, Plaintiff recorded, performed keyboards, and coordinated musical arrangements for various Magic Circle artists. Dkt. No. 1

("Complaint") ¶ 22; Dkt. No. 39 ("Amended Answer") ¶ 22. He also played keyboards for HolyHell, a heavy metal band led by his wife, lead singer Mary Ellen Breon. Defs.' SMF ¶ 1; Pl.'s RSMF ¶ 1. DeMaio Dep. at 28.[3] From 2007 until at least 2010, Plaintiff and HolyHell entered into a series of written agreements with Magic Circle to produce at least one album and perform on live tours, among other things. See Dkt. No. 39 at 36–41 ("2007 Artist Agreement"), 42–44 ("2007 Service and Nondisclosure Agreement"), 45–49 ("2009 Artist Agreement"), 50–54 ("2010 Artist Agreement"), 55–57 ("2010 Service and Nondisclosure Agreement") (collectively, the "2007–2010 NDA and Artist Agreements").[4] The 2007–2010 NDA and Artist agreements addressed copyright ownerships, compensation, and other terms of the parties' collaboration on HolyHell's first album, concerts, and tours.

On December 22, 2011, Plaintiff and Breon met with "Magic Circle management"—DeMaio, Operations Manager Susan Wagner, and head of business affairs Manoel Arruda—"to discuss the prospects of preparing HolyHell's second full-length album, which was later tentatively titled 'Darkness Visible,' along with associated touring and other marketing opportunities." Defs.' SMF ¶ 8; Pl.'s RSMF ¶ 8. During that meeting, the parties reviewed Magic Circle's proposed budget for the album and associated touring, which was a spreadsheet indicating the projected costs and revenues. Defs. SMF ¶ 11; Pl.'s RSMF ¶ 11; Dkt. No. 153-2 at 5–15 ("Palomo Affidavit") ¶ 12 ("During the meeting a written financial projection and other matters concerning the prospective album and tours was discussed."); see also Dec. 22, 2011 Tr.

---

[3] DeMaio's deposition is Exhibit 23 to the May 21, 2018 Affidavit of Benjamin Klebanoff and spans Dkt. No. 177-1 at 1074–1247.

[4] The 2007 Artist Agreement, 2007 NDA, 2009 Artist Agreement, 2010 Artist Agreement, and 2010 NDA are Exhibits A, B, C, D, and E to the Amended Answer.

at 39–41.[5] The spreadsheet noted that Magic Circle and HolyHell would split the profits from the project 50/50. Palomo Aff. Ex. 10 ("Budget Proposal").[6] At the end of the meeting, Breon remarked that the detailed information on the spreadsheet was "overwhelming," and that she needed "to take a hot bath to think about it." Dec. 22, 2011 Tr. at 41.

Defendants assert that at that December 2011 meeting, Plaintiff and HolyHell "agreed to produce the new full-length studio album, with a minimum of 10 newly written, fully recorded songs, ready to mix and master, to be completed no later than May 2012." Am. Answer ¶ 187. Plaintiff disputes that the parties had any contract regarding Darkness Visible, let alone a settled number of songs or deadline.

Nevertheless, the parties agree that in early 2012, Breon, Plaintiff, and the rest of HolyHell "proceeded with the second HolyHell recording," whose "working title was 'Darkness Visible.'" Pl.'s RSMF ¶ 16; Defs.' SMF ¶ 16. "Various members of HolyHell came into Magic Circle's offices" in Auburn, New York "to record various pieces over the spring of 2012 in support of this project." Palomo Aff. ¶ 12. Magic Circle reimbursed HolyHell members for their travel expenses, including local hotel rooms. Defs.' SMF ¶ 19; Pl.'s RSMF ¶ 19. From January to May 2012, while HolyHell recorded songs for the album, Plaintiff, Breon, and Magic Circle management exchanged emails concerning the timeline, finances, pricing, and logistics for the album production and an upcoming tour in Europe scheduled for summer 2012. See Palomo Aff. ¶ 12; see also Dkt. No. 153-2 at 69 ("January 23, 2012 Wagner Email"); Feb. 5, 2012 Wagner

---

[5] The December 22, 2011 Transcript is Exhibit 9-T to Plaintiff's Affidavit. An audio recording of the transcribed conversation was filed conventionally with the Court. As the recording and transcript begin mid-conversation, the Court has only a partial record of it.

[6] The Budget Proposal, Exhibit 10 to Klebanoff's Affidavit, was filed conventionally with the Court under seal.

Email; Dkt. No. 151-2 at 6–21 ("Spring 2012 Emails").[7] Magic Circle also coordinated and paid for several photo shoots for HolyHell to promote Darkness Visible. Defs.' SMF ¶ 21; Pl.'s RSMF ¶ 21. Defendants submitted business records indicating that the company paid production expenses for the album, tour, and related merchandising. Dkt. No. 151-2 at 31 ("HolyHell - Darkness Visible Project Financial Summary"). They assert that "[i]n total, Magic Circle invested $160,300.28 in unrecouped capital towards the Darkness Visible project," though Plaintiff disputes this figure. Defs.' SMF ¶ 24; Pl.'s RSMF ¶ 24.

In May 2012, Plaintiff and Breon met with Magic Circle management, including DeMaio, Wagner, and Arruda, to discuss the album and upcoming tour. Pl.'s SMF ¶ 31, Defs.' RSMF ¶ 31. There was a consensus that the album production was behind schedule. May 2012 Tr. at 6–7, 13–15, 24–25.[8] In February and March, 2012, Magic Circle's Manoel Arruda had sent a series of emails to HolyHell repeating that "ALL songs need[ed] to be uploaded" by May 1, 2012, Spring 2012 Emails at 8–12, but by May, the band had only recorded four songs, May 2012 Tr. at 33. DeMaio contends that HolyHell was at fault for the delay, and states that in the May 2012 meeting, he "offered various solutions to the problems created by HolyHell failing to complete the Darkness Visible album." Dkt. No. 167-1 ("July 2018 DeMaio Affidavit") ¶ 9. In any event, it is clear DeMaio suggested at that meeting that HolyHell release their three or four finished songs digitally, before the summer tour. May 2012 Tr. at 33–34. That said, the parties still contemplated that they would release a physical CD in fall 2012. Id. at 17, 36–38, 80. Magic Circle subsequently drafted a press release stating that it would release "3 songs from the

---

[7] Wagner's February 5, 2012 email is Exhibit 12 to Palomo's May 21, 2018 Affidavit. The Spring 2012 Emails are Exhibit 1 to DeMaio's May 2018 Affidavit.

[8] The May 2012 transcript is Exhibit 19-T to Palomo's May 21, 2018 Affidavit. An audio recording of the meeting was also filed conventionally with the Court.

forthcoming long-play album" in June 2012, but that a full album would be released in "Fall 2012." Dkt. No. 151-3 at 78 ("Press Release"). Magic Circle released a record entitled "Darkness Visible: the Warning," containing four songs, in June 2012. Def.'s SMF ¶ 25; Pl.'s RSMF ¶ 25.

HolyHell went on tour with DeMaio's band, Manowar, in June and July, 2012, performing in Romania, Italy, Sweden, and Germany. Pl.'s SMF ¶ 39; Defs.' RSMF ¶ 39. Magic Circle organized the tour and paid for a crew to support both Manowar and Magic Circle while in Europe. Wagner Dep. at 230–31.[9] Plaintiff authorized Magic Circle to ship his equipment (including keyboards, amplifiers, synthesizers, and other electronics) to Europe through Rock-It Cargo, a third-party shipper. See Pl.'s SMF ¶¶ 42–43; Defs.' RSMF ¶¶ 42–43. When the tour ended, Defendants stored the equipment in a warehouse in Germany. July 2018 DeMaio Aff. ¶ 18.

Due to "irreconcilable conflicts," Breon and HolyHell decided to stop working with Magic Circle after the tour in the summer of 2012. Palomo Aff. ¶ 16; Pl.'s SMF ¶ 40; Defs.' RSMF ¶ 40. Plaintiff, however, continued to work with Magic Circle until March 2013. Pl.'s SMF ¶ 41; Defs.' RSMF ¶ 41. In fall 2012, Plaintiff asked if his friends could retrieve his equipment from storage in Europe, before it was shipped back to the United States. Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47; DeMaio Dep. at 204. However, Magic Circle had used a customs permit called a "carnet" to ship Plaintiff's equipment to and from Europe. Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47; DeMaio Dep. at 204; Dkt. No. 167-1 at 15–45 ("Carnet").[10] The Carnet, which allows shippers to waive import-export duties for merchandise remaining only temporarily in Europe,

_____

[9] Susan Wagner's Deposition is Exhibit 25 to Klebanoff's Affdavit, Dkt. No. 153-1 at 1355–1466.

[10] The Carnet is Exhibit 3 to DeMaio's July 2018 Affidavit.

required that the equipment be "brought back through the proper channels, through the shipping company," meaning Rock-It. DeMaio Dep. at 204. Nevertheless, DeMaio attempted to accommodate Plaintiff's request, asking Rock-It if Plaintiff could "pick up his equipment himself, in Europe." Id. at 205. He was told (and relayed to Plaintiff) that the Carnet made it "impossible" for Plaintiff to retrieve the equipment in Europe, id. at 205, but that Plaintiff "would be able to retrieve the equipment when it was returned to the United States," Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47.

The equipment was shipped back to the United States in the spring of 2013. Pl.'s SMF ¶ 48; Defs.' RSMF ¶ 48. While it was in transit, Plaintiff was forced to return to Mexico because his visa application was denied. Pl.'s SMF ¶ 49. In April 2013, upon learning his equipment had arrived in the United States, Plaintiff made several more requests by email to arrange for its retrieval. Pl.'s SMF ¶ 51; Defs.' RSMF ¶ 51; see also Palomo Aff' ¶¶ 23–27; Dkt. No. 177-3 at 64–75 ("April 2013 Emails").[11] DeMaio and Arruda responded by asking Plaintiff to sign certain releases concerning the end of his professional relationship with Magic Circle and the condition of his musical equipment. Pl.'s SMF ¶ 52; Defs.' RSMF ¶ 52; Palomo Aff. ¶ 24. Arruda forwarded, and requested Plaintiff sign, documents by which he would agree to: release any claims Plaintiff had against Magic Circle, assign the rights to Plaintiff's "work product" to Magic Circle; deliver "[a]ny and all computer files," "master recordings," and other property to Magic Circle; and release all legal claims he had against the company—among other things. Pl.'s SMF ¶¶ 52–54; Defs.' RSMF ¶¶ 52–54; Dkt. No. 177-3 at 76–87 ("General Releases"). Plaintiff refused to sign the releases. Pl.'s SMF ¶ 55; Defs.' RSMF ¶ 55. On May 16, 2013, Plaintiff's counsel wrote a letter to Magic Circle's counsel, David Thurston, requesting the "return of

---

[11] The April 2013 Emails are Exhibits 44–48 of Palomo's Affidavit.

[Plaintiff's] equipment without any conditions." Dkt. No. 153-1 at 100–101 ("May 16, 2013 Alcott Letter").[12] Thurston replied that Plaintiff "*had to* sign the General Release Agreement 'to provide for the orderly transfer . . . of Mr. Palomo's property." Pl.'s SMF ¶ 59 (quoting Dkt. No. 153-1 at 110 ("June 12, 2013 Thurston Letter"))(emphasis added).[13]

From June 2013 to December 2015, Plaintiff made several more requests for the return of his equipment, which Defendants ignored. Pl.'s SMF ¶ 61; Defs.' RSMF ¶ 61. Exasperated, in November 10, 2014, Plaintiff wrote: "I'll ask again to have a return date(s) for my equipment and personal property, as I mentioned multiple times on all the emails that have been ignored." Dkt. No. 177-3 at 93 ("Nov. 10, 2014 Email"). "[Y]our company(ies) is holding against my will my personal property with a notarized value of 80,000 USD . . . [even though] I have been in a constant manner trying to appoint a date to retrieve such property." Id.

Defendants still have Plaintiff's equipment. Pl.'s SMF ¶ 63; Defs.' RSMF ¶ 63. After leaving Magic Circle in spring 2013, Plaintiff retained computer files containing audio recordings, called "stems," from the spring 2012 recording session at Magic Circle. Pl.'s SMF ¶ 38 (citing Palomo Aff. ¶ 15 & Ex. 21). Although HolyHell never finished "Darkness Visible," in June 2013, the band independently "rerecorded the work they had begun in 2012 leading up to the summer 2012 tour," along with a few new songs, and released at least one song one (called "Invictus") on its Facebook page in 2014. Pl.'s SMF ¶¶ 65–67; Defs.' RSMF ¶¶ 65–67. The

---

[12] The letter is Exhibit 10 to Klebanoff's Declaration.

[13] The June 12, 2013 Thurston Letter is Exhibit 13 to Klebanoff's Affidavit. In their Response to Plaintiff's Statement of Material Facts, Defendants denied paragraph 59 to the extent that "Mr. Thurston's letter did not make any reference to whether Mr. Palomo had retained any property of Defendants." Defs.' RSMF ¶ 59. However, they did not address the statement that Plaintiff "had to sign the General Release Agreement" to obtain his property. Pl.'s SMF ¶ 59. Therefore, the Court deems it admitted that Thurston's letter conveyed that Plaintiff was required to sign the release to obtain his equipment. L.R. 7.1(a)(3).

parties dispute who owns the copyrights to these recordings—the subject of a suit pending in the New York State Supreme Court, Cayuga County. Defs.' RSMF ¶ 69.

### B. Procedural History

Plaintiff filed this case on December 28, 2015, asserting claims for conversion, trespass to chattels, replevin, and interference with prospective economic advantage. Compl. In April 2017, Defendants advanced their counterclaims for breach of contract and unjust enrichment. Am. Answer ¶¶ 144–230. The Court subsequently dismissed the trespass to chattels claim, but denied Defendants' motion to dismiss the remaining claims. Dkt. No. 21 ("January 2017 Order"). Defendants' counterclaims for breach of contract and unjust enrichment also survived Plaintiff's motion to dismiss. Dkt. No. 99 ("December 2017 Order"); see also Palomo v. DeMaio, No. 15-CV-1536, 2017 WL 6001825, at *7 (N.D.N.Y. Dec. 4, 2017). Discovery has now concluded, and the cross-motions for summary judgment are ripe for decision.

## IV. PLAINTIFF'S CLAIMS

### A. Conversion and Replevin

#### 1. Statute of Limitations

Defendants argue that Plaintiff's conversion and replevin claims are time-barred. Defs.' Mem. at 9. Under New York law, a plaintiff must file such claims within three years of when they accrue. N.Y. C.P.L.R. §§ 203(a), 214(3). The parties agree that since Plaintiff filed his claims on December 28, 2015, they are untimely if they accrued before December 28, 2012. Defs.' Mem. at 11; Pl.'s Opp'n at 12. According to Plaintiff, this poses no problem; his claims accrued when Defendants refused to return his equipment unless he signed the release. Defendants, however, contend that the claims accrued in the summer of 2012, when they took

possession of Plaintiff's equipment. Defs.' Mem. at 10. The Court agrees with Plaintiff and finds that his claims are timely.

"Where replevin"—an action to recover wrongfully detained property—"is sought against the party who converted the property, the action accrues on the date of conversion." In re Peters, 821 N.Y.S.2d 61, 67 (N.Y. App. Div. 2006). "A cause of action for conversion accrues when all of the facts necessary to sustain the cause of action have occurred, so that a party could obtain relief in court." State v. Seventh Regiment Fund, Inc., 774 N.E.2d 702, 710 (N.Y. 2002) (citation omitted). Unless the defendant purchased the property in good faith (and Defendants admit they did not, Defs.' Opp'n at 9–11), the true owner can sue for conversion when the party in "unauthorized possession" of his property "act[s] to exclude [the owner's] rights . . . by exercising dominion and control over the property that is inconsistent with [the owner's] interests." Songbyrd, Inc. v. Estate of Grossman, 23 F. Supp. 2d 219, 222 (N.D.N.Y. 1998), aff'd, 206 F.3d 172 (2d Cir. 2000) (citations omitted).

To convert property, the defendant must do more than simply possess it. Seventh Regiment Fund, 774 N.E.2d at 710 ("A defendant who, though having custody of goods, does not exclude the owner from the exercise of his rights is not liable for conversion."). Rather, the tort requires the defendant to take "affirmative act" evincing an intent to take the property as his own:

> Thus, while it is not necessary for a defendant to take or destroy goods to constitute a conversion, it is also not sufficient for a defendant secretly to declare ownership, when that declaration does nothing to inform the owner or any other interested party that an interference with ownership is intended. Some affirmative act—asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion.

Id. at 710–11.

Since the traditional remedy for conversion is a "forced sale" to the defendant, the "affirmative act" of interference must be "sufficiently serious to justify requiring defendant to pay the full value of the property." Bank Brussels Lambert v. Credit Lyonnais, No. 93-CV-6876, 2000 WL 174955, at *3 (S.D.N.Y. Feb. 15, 2000) (citing Restatement (Second) of Torts § 222A (1965)). This depends on "the extent and duration of the interference," the actor's intent, and the inconvenience or expense caused to the plaintiff. Id. Thus, when a thief or black-market buyer takes property in bad faith and "openly deals with [it] as [her] own," such that "circumstances show that the defendant knows [she] has no right to the goods," the claim accrues. Wallace Wood Properties, LLC v. Wood, 669 F. App'x 33, 34 (2d Cir. 2016) (quoting Seventh Regiment Fund, 746 N.Y.S.2d at 646)). A defendant may also convert property through "[a]n express, unqualified, or improperly qualified refusal to surrender" it. Restatement (Second) of Torts § 237. However, "[w]hen a defendant's possession of the property was initially lawful, there is no conversion unless the defendant refuses the owner's demand to return the property or wrongfully transfers or disposes of it before a demand is made." Regions Bank v. Wieder & Mastroianni, P.C., 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007), aff'd, 268 F. App'x 17 (2d Cir. 2008).

In Hoelzer v. City of Stamford, Conn., the Second Circuit held that an art restorer did not convert the owner's paintings by merely acquiring them from a third party and holding them for "storage and restoration." Songbyrd, 206 F.3d at 182 (characterizing Hoelzer, 933 F.2d 1131, 1133 (2d Cir. 1991)). The court held that the restorer did "nothing . . . that might have alerted" the owner that he was asserting an "adverse claim" to the artwork (and the owner's replevin claim did not accrue) until he refused the owner's demand for its return. Hoelzer, 933 F.2d at 1137. Similarly, in Songbyrd, the plaintiff-artist sent the defendant-record company a set of

master audio recordings to hold for "demonstration" purposes. <u>Songbyrd</u>, 206 F.3d at 182. Relying on <u>Hoelzer</u>, the court held that the artist's claim did not accrue until defendant licensed the tapes to another record company. <u>Id.</u> Like the art restorer in <u>Hoelzer</u>, while the record company merely stored the recording, it was "a mere bailee who had not, prior to demand and refusal, acted to assert ownership." <u>Id.</u>

Likewise, Defendants did nothing "that might have alerted" anyone they intended to commandeer Plaintiff's equipment while they stored it for him in 2012. <u>Hoelzer</u>, 933 F.2d at 1137. As in <u>Songbyrd</u>, Plaintiff initially authorized Defendants to take custody of the property, to ship it to Europe for the tour through Rock-It. Pl.'s SMF ¶ 42; Defs.' RSMF ¶ 42. The carnet required Magic Circle to return the equipment to the same shipping container for transport back to the United States. Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47; DeMaio Dep. at 204. Accordingly, "at the end of the tour," Magic Circle "loaded [the equipment] into Magic Circle's rented trucks," brought it to Magic Circle's warehouse in Germany, then shipped it through Rock-It back to the United States as planned. July 2018 DeMaio Aff. ¶ 18; Defs.' SMF ¶¶ 47–48; Pl.'s RSMF ¶¶ 47–48. At most, therefore, Magic Circle moved property initially entrusted to it "from one position to another," showing no "intention to exercise further control over it or to deprive [Plaintiff] of its use." Restatement (Second) of Torts § 221. No reasonable jury could find that this authorized custody signaled the "defiance" of Plaintiff's rights required to constitute conversion. N.Y. Pattern Jury Instr. Civ. 3:10 cmt. ("[T]he mere removal of property from one place to another, although it may constitute a trespass, is not a conversion unless the goods are, as a result of the removal, destroyed or consumed").

Moreover, Defendant did not improperly refuse any demand by Plaintiff for his equipment in 2012. After the tour, Plaintiff did ask DeMaio whether Plaintiff's associate could

retrieve the equipment in Europe; but DeMaio informed him that under the terms of the carnet, that it was "impossible" for Magic Circle to release the property in Europe. DeMaio Dep. at 205. He assured Plaintiff that he "would be able to retrieve the equipment when it was returned to the United States," Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47; Mar. 17, 2013 Wagner Email (assuring Plaintiff that Magic Circle would "of course store [it] . . . in our warehouse until you can pick it up").[14] Such a refusal to release property until feasible is not conversion. See Regions Bank, 526 F. Supp. 2d at 414, 416 (explaining that where an owner authorized defendant to distribute property to a third party, defendant's "inability" to retrieve the property for return on demand was not conversion) (citing Nat'l Steamship Co. v. Sheahan, 122 N.Y. 461, 465 (1890)); see also 23 N.Y. Jur. 2d § 33 ("[W]here an owner of chattels demands them of another who rightfully obtained custody or possession of them, but who has no authority to deliver or dispose of them, their detention in such a case is not a conversion."); Restatement (Second) of Torts § 238 ("One in the possession of a chattel does not become a converter by making a qualified refusal immediately to surrender the chattel when the circumstances are such that the demand for immediate surrender is unreasonable.").[15]

For the first time in their Opposition to Plaintiff's Summary Judgment Motion, Defendants suggest that they seized the equipment in July 2012 in bad faith. Defs.' Opp'n at 10. In an affidavit executed on the day Defendants filed the Opposition, DeMaio states that when

---

[14] The March 17, 2013 Wagner Email is Exhibit 43 to Palomo's Affidavit.

[15] Plaintiff complained that Magic Circle would not release the equipment to his associates in Europe, as he preferred. Defs.' Mem. at 11 (citing Defs.' SMF ¶¶ 29–33, in turn citing Huffman Aff. Exs. 9–12). But Plaintiff's feelings on the matter do not make reasonable his demands to release his property in Europe, which Defendants admit was "impossible" because it would have violated customs law or required them to pay exorbitant duties, DeMaio Dep. at 205. See 23 N.Y. Jur. 2d § 33.

Magic Circle loaded Plaintiff's equipment onto its trucks at the end of the tour in July 2012 and held it in storage, it intended to keep the equipment as collateral in case Plaintiff (and the rest of HolyHell) failed to deliver Darkness Visible. July 2018 DeMaio Aff. ¶ 17; see also Defs.' Opp'n at 12 ("[A]t the end of the tour, Magic Circle loaded the HolyHell equipment onto trucks . . . and confiscated the equipment . . ., and stored the equipment in its warehouse in Germany to secure its more-than $160,000 investment into the Darkness Visible album project."). Defendants assert that this started the clock on Plaintiff's conversion claim in July 2012. Id. at 10.

This argument is meritless for two reasons. First, DeMaio's June 2018 Affidavit contradicts his deposition testimony that the reason he could not release Plaintiff's equipment in Europe was that the carnet made it "impossible"—not because DeMaio had commandeered the equipment as collateral. DeMaio Dep. at 205–07.[16] Indeed, DeMaio testified that he attempted to accommodate Plaintiff's request, asking Rock-It Cargo if Plaintiff could "pick up his equipment himself, in Europe." Id. at 205. When Rock-It said no, DeMaio assured Plaintiff that he "would be able to retrieve the equipment when it was returned to the United States," without mentioning any concerns about the album. Pl.'s SMF ¶ 47; Defs.' Resp. to Pl.'s SMF ¶ 47. His eleventh-hour affidavit cannot erase that testimony. See Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A]n affidavit . . . contradicting the affiant's previous deposition testimony is insufficient to create a genuine issue of fact."). There remains, therefore, no competent evidence that Defendants seized Plaintiff's equipment in bad faith in 2012. Second, Defendants' purported secret motives concerning the equipment they were entrusted to transport are immaterial

---

[16] DeMaio explained his understanding of the carnet at length: "The purpose of a carnet is to ensure that people do not improperly bring equipment over to another country and then sell it, thereby profiting and not paying taxes and so forth. It is an assurance bonded with the U.S. government that you will use this equipment to perform and bring it back as it was. So you can't remove items." DeMaio Dep. at 207.

because—as explained above—they did "nothing to inform [Plaintiff] or any other interested party that an interference with ownership [was] intended." <u>Seventh Regiment Fund</u>, 746 N.Y.S.2d at 645–46.

Finally, Defendants assert that Plaintiff, by arguing that Defendants held his equipment in good faith until 2013, changes the theory he asserted in the Complaint. In the Complaint, Plaintiff asserted that "[t]his action arises out of Defendants' unlawful and brazen theft of Plaintiff's musical equipment," and that "DeMaio intentionally stole and has continued to withhold that equipment." Defs.' Opp'n at 9 (quoting Compl. ¶¶ 1, 3). Defendants contend that based on these allegations, "the matter accrue[d] at the time of theft," which occurred when Magic Circle took the property at the end of the 2012 tour. <u>Id.</u> at 9.

"A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim." <u>Thomas v. Egan</u>, 1 F. App'x 52, 54 (2d Cir. 2001). Therefore, "courts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment." <u>Casseus v. Verizon N.Y., Inc.</u>, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010); <u>see also</u> <u>Lyman v. CSX Transp., Inc.</u>, 364 F. App'x 699, 701–702 (2d Cir. 2010) (affirming decision not to consider new theory of liability because complaint and interrogatory responses "were insufficient to put defendant on notice" of it).

However, Plaintiff has alleged from the start that the alleged "theft" occurred when Magic Circle refused to return the equipment in 2013. The Complaint stated that

> When Mr. Palomo's equipment arrived in the United States, Mr. Palomo spoke to DeMaio over the phone and informed DeMaio that he would pick up the equipment from Magic Circle's storage. DeMaio refused to allow Mr. Palomo to pick up his equipment and instead demanded that Mr. Palomo sign a release. This release provided that Mr. Palomo would waive any and all claims against DeMaio and Magic Circle, and transfer all intellectual property rights in HolyHell's music to DeMaio and Magic Circle. Mr. Palomo refused to sign the release and, consistent with his threat of extortion, DeMaio has refused to release Mr. Palomo's equipment.

16

Compl. ¶ 2; see also id. ¶ 31 (stating that Plaintiff had "agreed to a pick-up in the United States," and characterizing the 2013 "General Release Agreement" as Defendants' "extortion demand"). These allegations gave Defendants fair warning of Plaintiff's claim that Defendants converted his equipment when they refused to release it in the United States, not when they transported it in Europe. Indeed, when arguing their motion to dismiss, Defendants construed the Complaint to "allege[ ] a cause of action for refusal to return the alleged equipment," not for unlawfully seizing it. Dkt. No. 13-1 ("Memorandum in Support of Motion to Dismiss") at 7. Moreover, in denying Defendants' motion, the Court found a plausible claim that Defendants converted the equipment when they refused to return the equipment in April 2013. Jan. 2017 Order at 7.[17]

Therefore, Defendants had fair notice of the nature of Plaintiff's conversion and replevin claims, and the undisputed facts compel a finding that those claims accrued in 2013 and are timely.

### 2. Merits of Conversion and Replevin Claims

Plaintiff has established that Defendants converted his equipment in 2013. It is undisputed that Defendants have had possession of Plaintiff's equipment since 2012, and that they did not return Plaintiff's equipment despite Plaintiff's multiple requests in spring 2013 that they do so. Pl.'s SMF ¶¶ 58, 61–63; Defs.' RSMF ¶¶ 58, 61–63. From April 15 to 21, 2013, Plaintiff repeatedly asked by email, by phone, and through his attorney to be allowed to pick up

---

[17] Even if Plaintiff had alleged that Defendants stole the equipment in 2012, he could also allege they converted it in 2013 by refusing his demands to return it; "a plaintiff is permitted to advance alternative theories of liability for a defendant's allegedly wrongful conduct." Benefield v. Pfizer Inc., 103 F. Supp. 3d 449, 463 (S.D.N.Y. 2015); see also Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

his equipment from Magic Circle's U.S. warehouse. See Palomo Aff. ¶¶ 23–27; Apr. 2013

Emails; May 16, 2013 Alcott Letter. Instead of arranging a date for Plaintiff to pick up his

property, Magic Circle responded by asking Plaintiff to sign lengthy releases waiving various

legal rights. Pl.'s SMF ¶¶ 52–54; Defs.' RSMF ¶¶ 52–54. Both DeMaio and Arruda told Plaintiff

that one "release," certifying that Plaintiff's equipment was "in the same condition as when [he]

left it, etc.," would "*need to be signed* in person at the time [Plaintiff] picked up his] equipment."

Dkt. No. 177-3 at 68 ("April 15, 2013 DeMaio Email"), 74 ("April 19, 2013 Arruda Email")

(emphasis added). Magic Circle's counsel also conveyed that Plaintiff "*had to* sign the General

Release Agreement to provide for the orderly transfer of [Plaintiff's] property." Pl.'s SMF ¶ 59;

June 12, 2013 Thurston Letter (emphasis added).

Statements by both Wagner and DeMaio show their intent not to release Plaintiff's

equipment unless he signed the releases. DeMaio testified that his counsel sent the June 12, 2013

Letter "just before" Magic Circle "instituted [a] lien" on Plaintiff's equipment. DeMaio Dep. at

233; see also id. at 202–03 (testifying that Magic Circle "unilaterally put a lien on [Plaintiff's]

equipment"). DeMaio later confirmed that he had conditioned the return of Plaintiff's equipment

on Plaintiff "releasing any claims that he had against Magic Circle." July 2017 DeMaio Aff. ¶ 21

(stating that he would "return [the] equipment . . . in exchange" for Plaintiff signing the releases).

In addition, in a June 6, 2013 email to DeMaio, Wager wrote, "I think we very well have reason

to demand the return of all of our files, and then the signature of the release documents, before

anything else happens." Dkt. No. 153-1 ("June 6, 2013 Wagner Email") at 107.

Contrary to DeMaio's and Wagner's belief, there was no "lien" on Plaintiff's equipment,

and Defendants had no security interest or contractual right to retain the equipment. Therefore,

the jury could find that Defendants' 2013 demands that Plaintiff waive legal rights and return

company property in order to retrieve his own equipment constituted a "qualified refusal to surrender a chattel based upon reasons which do not justify it"—that is, a conversion. Restatement (Second) Torts § 241 cmt. c (stating that, for example, a dry cleaner who informs a customer "that he will not deliver the clothing until [the customer] has paid a bill for past services" is liable for conversion).

Even if Defendants' Spring 2013 Emails did not make clear that they were refusing to return Plaintiff property unless he waived his rights, their failure to respond to Plaintiff's subsequent requests for his property completed the conversion. A refusal to surrender property need not be stated "in express terms;" it made be "found by implication from the defendant's conduct." Restatement (Second) of Torts § 237. "Equivocation . . . or a failure to reply at all to the demand may be enough to amount to a refusal." Id. As Plaintiff wrote to DeMaio, Wagner, Arruda, and Thurston in November 2014, Defendants continued to "hold[ ] against [his] will [his] personal property with a notarized value of 80,000 USD" despite his "constant" attempts "to appoint a date to retrieve" it. Nov. 10, 2014 Email. Accordingly—although reasonable jurors could debate *when* Plaintiff should have understood Defendants intended to keep his property on the unlawful condition that he sign the releases—the jury would be compelled to find that Defendants converted Plaintiff's property in 2013.[18]

---

[18] Defendants advance a brief argument that Plaintiff has not produced evidence of a civil conspiracy to commit conversion among DeMaio and Magic Circle's various entities. See Defs.' Opp'n at 14–15. However, "New York does not recognize civil conspiracy to commit a tort as an *independent* cause of action." Great Lakes Motor Corp. v. Johnson, 68 N.Y.S.3d 614, 617 (N.Y. App. Div. 2017). Rather, "allegations of conspiracy" serve "only to connect the actions of separate defendants with an otherwise actionable tort." Abacus Fed. Sav. Bank v. Lim, 905 N.Y.S.2d 585, 588 (N.Y. App. Div. 2010). Defendants admit that theyall participated in the decision to withhold Plaintiff equipment from him and still possess that equipment. See Pl.'s SMF ¶¶ 52–63 (admitting that "Defendants" took the relevant actions and "are still in possession of Mr. Palomo's equipment"). Therefore, Plaintiff is entitled to a finding that all of the remaining Defendants converted his equipment.

*3. Unclean Hands*

Effectively conceding that they withheld Plaintiff's equipment, Defendants argue that they were "entitled to retain the equipment as a result of Plaintiff's unclean hands and actions towards Magic Circle." Defs.' Opp'n at 11. Specifically, they contend that Plaintiff breached his contract with Magic Circle when he refused to return company property or complete the Darkness Visible album. Id. at 11–12; see also Defs.' Mem. at 20, 26. However, the doctrine of "unclean hands" "is an equitable defense to equitable claims" and does not apply to claims that "seek damages in an action at law." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 607 (2d Cir. 2005). A claim for "conversion of personal property" seeks damages and is "unmistakably [an] action[] at law." Ross v. Bernhard, 396 U.S. 531, 533 (1970). As such, Plaintiff's breach of contract, even if proven, would not bar his conversion claim.

Nor would it bar his equitable replevin claim. "The unclean hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks'" (*i.e.*, the return of Plaintiff's property). Henderson v. United States, 135 S. Ct. 1780, 1783 (2015). Its "rationale . . . is that equity will not aid a person to reap the benefits of his own misconduct." Restatement (Second) of Torts § 940. "The court must inquire whether plaintiff is attempting to charge defendant with liability for some act in which plaintiff itself participated or because of which plaintiff is at fault as well as defendant." Jacoby-Bender, Inc. v. Jacques Kreisler Mfg. Corp., 287 F. Supp. 134, 135 (S.D.N.Y. 1968). The defense may apply, for example, if a plaintiff breached a contract or fraudulently obtained a patent he sought to enforce. See Peconic Surgical Grp., P.C. v. Cervone, 930 N.Y.S.2d 175 (Sup. Ct. 2011) (contract); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814–15 (1945) (patent). However, if the "plaintiff's offenses are merely collateral"

to his claim, he "may still recover for defendant's wrongs;" "the fact that [the] plaintiff himself may have sinned in some other connection does not make him an outlaw, deprived of all legal rights." Jacoby-Bender, 287 F. Supp. at 135. A "misdeed is regarded as 'collateral' . . . when the right for which the plaintiff seeks protection in the injunction suit did not accrue to him because of the misdeed." Restatement (Second) of Torts § 940. Defendants do not assert that Plaintiff came to own his equipment through any misconduct. Nor is Plaintiff seeking to enforce the contract Defendants allege he breached. Therefore, Plaintiff's alleged misconduct is "collateral" to his claims, and the doctrine of unclean hands is inapplicable.

In short, equity does not entitle Defendants to institute a "unilateral lien" on Plaintiff's equipment. DeMaio Dep. at 202–03. Rather, it obliges them to return it. As Plaintiff has proven conversion, he is entitled to replevin as a matter of law.

*4. Damages*

Defendants assert that Plaintiff has not offered enough evidence to prove his damages. "Under New York law, '[d]amages for conversion are usually the value of the property at the time of conversion.'" Schatzki v. Weiser Capital Mgmt., LLC, No. 10-CV-4685, 2012 WL 169779, at *7 (S.D.N.Y. Jan. 19, 2012) (quoting Sindhwani v. Coe Bus Serv. Inc., 861 N.Y.S.2d 795, 708 (N.Y. App. Div. 2008)). As indicated earlier, a reasonable jury could reach different conclusions as to whether Defendants converted the equipment (1) when they demanded Plaintiff sign releases to retrieve it or (2) when they failed to return the equipment within a reasonable time after he requested it. Defendants argue that Plaintiff cannot establish the value of his equipment at either of those points. Defs.' Mem. at 13.

"The rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only that the loss or damage be

capable of ascertainment with reasonable certainty." <u>Reichman v. Warehouse One, Inc.</u>, 569 N.Y.S.2d 452, 453 (N.Y. App. Div. 1991) (citing 36 N.Y. Jur. 2d Damages § 12). Where the existence of damages are established, "[r]ecovery will not be denied merely because the quantum of damages is uncertain or difficult to ascertain." <u>Shoecraft v. BBS Auto. Grp., Inc.</u>, 853 N.Y.S.2d 125, 126–27 (N.Y. App. Div. 2008). The loss need only be "capable of measurement based upon known reliable factors without undue speculation," 36 N.Y. Jur. 2d Damages § 12. Even if the plaintiff cannot prove market value with certainty, "an owner of personal property, 'familiar with its quality and condition, may testify as to its value'" if such testimony "include[s] some evidence of factors pertinent to establishing a reasonable monetary value to the owner, such as the [property's] original cost, their age and condition at the time of the conversion, and replacement cost." <u>Bertin v. Bertin</u>, 836 N.Y.S.2d 496 (N.Y. App. Term 2007) (citing <u>Fassett v. Fassett</u>, 475 N.Y.S.2d 154 and 36 N.Y. Jur. 2d, Damages §§ 82, 87).

Plaintiff has produced receipts showing the prices of the equipment when he purchased it between 2009 and 2012. <u>See</u> Dkt. No. 153-3 at 1–93 ("Receipts").[19] Defendants have not shown that the equipment meaningfully depreciated in value since that time; in fact, Plaintiff testified that he spent hours programming the electronic equipment and decorated it with customized artwork, increasing its intrinsic value to him. Pl.'s SMF ¶¶ 45–46; Palomo Aff. ¶ 18–19. He also provided photographs of the equipment, Dkt. No. 153-3 at 94–108 ("Equipment Photos"), and inspected it during this litigation, Pl.'s SMF ¶ 64; Defs.' Resp. to Pl.'s SMF ¶ 64; Klebanoff Aff. Ex. 32 ("Inspection Video").[20] In addition, the carnet lists the estimated value of each item of

---

[19] The receipts are Exhibit 23 to Palomo's Affidavit.

[20] The Inspection video was filed conventionally with the Court as Exhibit 32 to the May 22, 2018 Affidavit of Benjamin Klebanoff, Dkt. No. 153-1.

equipment when it was shipped in 2012. Dkt. No. 167-1 ("Carnet") at 16–45. These figures provide a benchmark upon which, considering Plaintiff's testimony as the owner and the corroborating photo and video evidence, the jury could estimate the value of the equipment when it was converted in 2013 without engaging in undue speculation. Shoecraft, 853 N.Y.S.2d at 126–27.

In addition, Plaintiff lost opportunities to participate in concert performances for HolyHell and has "been unable to complete business opportunities with multiple artists" while Defendants have withheld his equipment. Palomo Aff. ¶ 29. Defendants incorrectly assert that it is "well established" that lost profits for "work that Plaintiff was allegedly unable to perform because he lacked equipment and for rental income for the alleged converted equipment . . . are *not* [a] proper measure[ ] of damage for conversion." Defs.' Opp'n at 13 (emphasis added). In New York, just the opposite is true. "Lost profits are allowed where either from the nature of the article or peculiar circumstances of the case they might reasonably be supposed to follow from the conversion.'" Schatzki, 2012 WL 169779, at *7 (quoting Sindhwani, 861 N.Y.S.2d at 708 and citing Fantis Foods, Inc., v. Standard Importing Co., 425 N.Y.S.2d 783, 786 (N.Y. 1980)). Thus, even if the defendant returns the property, "[t]he owner . . . is entitled to recover as damages for the loss of the value of the use, at least the rental value of the chattel . . . during the period of deprivation," "even [if] the owner . . . had a substitute that he used without additional expense to him." Restatement (Second) of Torts § 931.

Defendants also argue that Plaintiff cannot establish lost profits flowing from the conversion because he "(1) had other keyboards and equipment after the alleged theft that Plaintiff elected to sell for quick cash rather than using it to earn income, and (2) [Plaintiff] has

had regular access to other keyboard equipment since the alleged theft." Defs.' Mem. at 15. It is true that a plaintiff "may not recover harm to his business that he could have avoided by using substitute equipment." Restatement (Second) of Torts § 931. However, Plaintiff sold his other keyboards in December of 2012, before the conversion occurred in 2013. Palomo Dep. at 476.[21] "There can be no duty to mitigate damages until the injury causing those damages actually occurs." Miller v. Lovett, 879 F.2d 1066, 1070 (2d Cir. 1989). And even if Plaintiff can borrow his associates' keyboard equipment, as Defendants contend, Defs.' SMF ¶¶ 51–52, he is still missing the battery of specialized, electronic equipment that he took on the European tour. Pl.'s SMF ¶ 43; Defs.' RSMF ¶ 43. Multiple artists who have worked with Plaintiff in the past submitted testimony that his lack of his own keyboards and other music equipment has made it impossible for them to collaborate with Plaintiff on several paying projects. See Dkt. No. 153-1 ("Fellow Artist Letters") at 114–145.[22] And Plaintiff testified that without the equipment, he cannot perform live with HolyHell. Palomo Aff. ¶ 29.

That said, given the above evidence, reasonable juries could weigh the testimony and evidence differently and, therefore, reach different conclusions regarding whether (and how much) Plaintiff's equipment changed in value since he purchased it, as well as the number and value of business opportunities Plaintiff had to forego because he lacked the necessary equipment. According, both motions for summary judgment are denied with respect to the measure of Plaintiff's damages resulting from the conversion.

---

[21] Plaintiff's deposition is Exhibit 20 to Declaration of Benjamin Klebanoff and is located at Dkt. No. 153-1 at 148–366.

[22] The Fellow Artist Letters are Exhibits 15–19 of Klebanoff's Affidavit.

24

### B. Tortious Interference with Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage ("TIPEA") under New York law, Plaintiff must establish that he "(1) had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (citation omitted). The New York Court of Appeals has held that the conduct must be "directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1104 (2004); see also Weitsman v. Levesque, No. 17-CV-727, 2018 WL 1990218, at *5 (N.D.N.Y. Apr. 25, 2018) ("[T]he defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.").

Plaintiff alleges that Defendants prevented him from performing with HolyHell and guitarist Joseph Stump, and undertaking multiple other business opportunities, by withholding his equipment. Pl.'s Mem. at 13. However, Plaintiff does not identify any act of interference directed toward HolyHell, Stump, or any other third party, and he does not address Defendants' contention that conduct constituting TIPEA must be directed at the plaintiff's business relation and not merely the plaintiff. See Pl.'s Mem. at 7–8; Pl.'s Reply at 8; Pl.'s Opp'n at 19. Therefore—while Plaintiff may be entitled to lost profits caused by Defendants' conversion—he has not has not rebutted Defendants' showing that he fails to meet the elements of a TIPEA claim. As such, that claim is dismissed.

## V.  DEFENDANTS' COUNTERCLAIMS

### A.  Breach of Contract

Under New York law, a breach of contract claim requires (1) a contract, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages. Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir. 2009).

> In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds. In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.

Id. at 787–88 (quoting Brown Bros. Elec. Contractors v. Beam Const. Corp., 361 N.E.2d 999, 1001 (N.Y. 1977)). The Court must first "determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." Kolchins v. Evolution Markets, Inc., 96 N.E.3d 784, 787 (N.Y. 2018) (quoting Cobble Hill Nursing Home v. Henry & Warren Corp., 548 N.E.2d 203 (1989)). Acceptance must "be clear, unambiguous and unequivocal." Kolchins v. Evolution Markets, Inc., 8 N.Y.S.3d 1, 9 (N.Y. App. Div. 2015).

In addition, to be enforceable, the agreement must be "reasonably certain in its material terms." Hudson & Broad, Inc. v. J.C. Penney Corp., Inc., 553 F. App'x 37, 39 (2d Cir. Jan. 28, 2014). A valid contract may "leave discrete material terms unspecified" only if it "set[s] mechanisms for objectively setting material terms in the future." Id. (citing Arbitron, Inc. v.

Tralyn Broadcasting, Inc., 400 F.3d 130, 137 (2d Cir. 2005)). "A court should find an agreement too indefinite [to be valid] only as a 'last resort' when it is 'satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear." Shann v. Dunk, 84 F.3d 73, 80 (2d Cir. 1996) (quoting Cobble Hill, 548 N.E. at 206). Nevertheless, "if there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." Cleveland Wrecking Co. v. Hercules Const. Corp., 23 F. Supp. 2d 287, 293 (E.D.N.Y. 1998), aff'd, 198 F.3d 233 (2d Cir. 1999).

Parties to a contract may demonstrate their mutual assent through conduct, as well as words. Leibowitz, 584 F.3d at 506–07. "Under New York law, even if a party subjectively does not intend to be legally bound, if his actions, gauged by an objective standard, support the conclusion that he accepted the agreement, he will be legally bound to honor the contract." Dodge St., LLC. v. Livecchi, 32 F. App'x 607, 611 (2d Cir. 2002). An "implied in fact contract requires proof of the same elements to establish an express contract—mutuality of intent, offer and acceptance, lack of ambiguity, and consideration"—which "can be inferred from the 'specific conduct of the parties, industry custom, and course of dealing.'" Patsy's Italian Rest., Inc. v. Banas, 508 F. Supp. 2d 194 , 218 (E.D.N.Y. 2007) (quoting Nadel Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 377 n.5 (2d Cir. 2000)). "A party's conduct indicates assent" to an offer "when 'he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" Leibowitz, 584 F.3d at 507 (quoting Restatement (Second) of Contracts § 19(2) (1981)).

The Court may find the parties struck an implied-in-fact deal if (1) neither party insisted on a written agreement and (2) one or both parties began performance. CAC Grp. Inc. v. Maxim

Grp. LLC, 523 F. App'x 802, 803–04 (2d Cir. 2013) (quoting <u>Winston v. Mediafare Entm't</u> <u>Corp.</u>, 777 F.2d 78, 80 (2d Cir. 1985)). It must also consider (3) whether the parties left terms open, suggesting that they anticipated more negotiations, and (4) whether the agreement at issue (considering business custom, the alleged agreement's complexity, and the parties' past dealings) is the kind normally committed writing. <u>Winston</u>, 777 F.2d at 82–83. There is "a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." <u>Arcadian Phosphates, Inc. v. Arcadian Corp.</u>, 884 F.2d 69, 73 (2d Cir. 1989).

In their counterclaims, Magic Circle alleges "two substantial breaches" of contract. Defs.' Mem. at 26.

### 1. *Failure to Produce Darkness Visible*

First, Magic Circle alleges that by "failing to complete the Darkness Visible album on or before the agreed deadline of May 1, 2012 (or before Plaintiff left Magic Circle)," Plaintiff breached an oral agreement the parties reached during their December 22, 2011 meeting or an implied-in-fact contract they consummated later. Defs.' Mem. at 19–26; Opp'n at 23–26. Defendants acknowledge that "Mr. Palomo . . . produced to Counter-Plaintiffs three newly written, fully recorded songs, ready to mix and master on or before May 2012." Amended Answer ¶ 191; <u>see also</u> July 2018 DeMaio Aff. ¶ 10 ("Magic Circle released an EP for HolyHell, entitled 'Darkness Visible: The Warning,' containing three new songs, along with a live track . . . to have new product to market for HolyHell during the summer 2012 tour."); Defs.' SMF ¶ 25 (stating that the four-track album was released in June 2012). However, they assert that Plaintiff promised to produce at least six more songs that he did not deliver. Am. Answer ¶¶ 187, 191.

A rational jury could conclude that Magic Circle offered HolyHell an album contract in December 2011. Before the December 22, 2019 meeting—in which Plaintiff, Breon, Wagner, and Arruda discussed the Darkness Visible album project, Defs.' SMF ¶ 9; Pl.'s RSMF ¶ 9— Magic Circle gave Breon a "budget proposal" spreadsheet estimating the project's costs and revenues. Defs.' SMF ¶ 9; Pl.'s RSMF ¶ 9 (indicating that Breon prepared a written summary of the meeting stating that Magic Circle would use "HolyHell income," including approximately $40,000 in revenue from ticket sales during the tour, to pay "the show and recording costs for Darkness Visible"). The Budget Proposal described a "360" arrangement" with a "50% artist share" of net profits. Budget Proposal at 2. DeMaio testified that in the music industry, a "360 degree" deal means that the production company pays production and marketing expenses and, after recoupment, splits the net profits with the band. Apr. 2018 DeMaio Aff. ¶ 9; DeMaio Dep. at 420 (stating that HolyHell was "to be paid 50 percent of any net profits after recoupment, based on our agreement of a 360-deal"). This is consistent with DeMaio's statements during the December 22, 2011 meeting, with which neither Plaintiff nor Breon took issue. See Dec. 22, 2011 Tr. at 39 ("[I]n a deal like ours, you know . . . we have this 50-50 split after expenses."). Accordingly, the jury could find that Magic Circle proposed to fund the Darkness Visible project and split the profits from ticket, album, and merchandise sales 50/50 with HolyHell.

That said, the parties did not reach an agreement regarding Darkness Visible on December 22, 2011. Although Magic Circle offered the 360 agreement, neither Breon nor Plaintiff accepted that offer during the meeting. Rather, Breon left the meeting saying that she needed to consider the proposed budget, without making any commitment. See Dec. 22, 2011 Tr. at 41 ("I feel like I got a lot of information, I want to go take a hot bath and think about it. I think it's very exciting information and all that. And, you know, this spreadsheet's a little

overwhelming."). There was, therefore, no "unequivocal acceptance" at that meeting. Kolchins, 96 N.E.3d at 787 (requiring that acceptance be "unequivocal").

Nevertheless, the jury may infer from HolyHell's conduct that they later accepted the deal. Though Breon did not accept the album contract that day, she also did not "express[ly] reserv[e] the right not to be bound" without a written agreement. Winston, 777 F.2d at 80. A reasonable factfinder could infer that HolyHell (including Plaintiff, who was the keyboardist and "producer for the Darkness Visible recordings," Pl.'s RSMF ¶ 14) accepted Magic Circle's performance of the contract by: (1) using Magic Circle's facilities, equipment, and personnel to record songs for the album and (2) accepting the company's payments of housing, travel, and touring and other promotional expenses without reservation. Defs.' SMF ¶¶ 19–21; Pl.'s RSMF ¶¶ 19–21; Wagner Dep. at 225–227; HolyHell - Darkness Visible Project Fin. Summ.[23] "Perhaps the strongest indicia that a party has assented to a contract is when that party accepts the benefits of the agreement without reservation." Dodge St., 32 F. App'x at 611; see also CAC Grp., 523 F. App'x at 805 ("Partial performance is a 'factor of major significance' when 'one party has partially performed, *and that performance has been accepted by the party disclaiming the contract.*') (citation omitted). Moreover, the jury can reasonably ascertain the contract's material terms: that Plaintiff and the rest of HolyHell would produce the Darkness Visible Album with Magic Circle's financial support, use the revenues to recoup the parties' costs, and split the

---

[23] Plaintiff argues that this document is inadmissible because DeMaio testified he cannot authenticate it. Pl.'s Opp'n at 29 (citing DeMaio Dep. at 391–92). However, "[m]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question will be presented in admissible form at trial, it may be considered on summary judgment." Jacobs v. New York City Dep't of Educ., 768 F. App'x 86, 88 (2d Cir. 2019). Susan Wagner testified that she is familiar with the document, how it was produced, and its contents: Magic Circle's expenses invested in the Darkness Visible Project. Wagner Dep. at 225–43. She could therefore authenticate the document as a business record, Fed. R. Evid. 803(6), and, in any event, could testify to its contents at trial.

profits from sales of the album (which Magic Circle would distribute) 50/50 between Magic

Circle and HolyHell.[24]

Plaintiff argues that two of the <u>Winston</u> factors militate against finding an enforceable

contract. First, there was no written agreement assigning Magic Circle the copyrights to

Darkness Visible. The Copyright Act requires a written agreement to transfer ownership of

copyrights, including exclusive licenses. <u>Robinson v. Buy-Rite Costume Jewelry, Inc.</u>, No. 03

CIV. 3619, 2004 WL 1878781, at *4 (S.D.N.Y. Aug. 23, 2004) (citing 17 U.S.C. § 204(a)).

Therefore, Plaintiff argues, a copyright assignment was an essential term of the alleged contract

"because without the copyrights, Defendants could not sell Darkness Visible;" therefore, without

a copyright assignment, there could be no enforceable contract. Pl.'s Opp'n at 23. He invokes the

"strong presumption" against recognizing contracts with "open terms." <u>Arcadian</u>, 884 F.2d at 73.

However, Plaintiff cites no case invalidating or refusing to enforce a record deal between

an artist and record company because the contract lacked a copyright assignment. In <u>Grappo v.</u>

<u>Alitalia Linee Aeree Italiane, S.P.A.</u>, on which Plaintiff relies, a software engineer licensed

customized software to an airline. 56 F.3d 427, 432 (2d Cir. 1995). The court found that the

---

[24] Plaintiff argues that Defendants failed to plead an implied-in-fact contract in their
Amended Answer and, therefore, cannot rely on that theory to survive summary judgment. Pl.'s
Opp'n at 25. As explained earlier, however, "federal pleading standards are fairly liberal and
require only that the defendant be put on notice of the claim." <u>RST (2005) Inc. v. Research in
Motion Ltd.</u>, No. 07-CV-3737, 2008 WL 5416379, at *9 (S.D.N.Y. Dec. 17, 2008). The
Amended Answer notified Plaintiff that Defendants were claiming he breached a promise to
produce a ten-song album called "Darkness Visible." Am. Answer ¶¶ 116–17, 186–87, 191.
Although the Amended Answer called this an "oral" agreement, it also stated that "additionally,
as part of each the 2011 Agreement and a separate contract with [Breon and HolyHell] for the
recording of Darkness Visible, [Defendants] advanced funds in excess of $160,000.00 on behalf
of HolyHell toward the 'Darkness Visible' project." <u>Id.</u> ¶ 118. These allegations are consistent
with Defendants' contention that Plaintiff accepted their December 2011 oral offer to collaborate
on Darkness Visible by accepting their financial support for the project.

license was, of course, the whole point of the contract, and brought it within the coverage of the New York UCC (which requires contracts worth more than $5,000 to be in writing). Id. In contrast, it is not at all clear that Magic Circle undertook the Darkness Visible project to obtain an exclusive copyright license to the recordings. Indeed, Magic Circle could sell the album with a *non-exclusive* license, which need not be in writing and can be implied when, as here, the author "creates a work at the request of the licensee [here, Magic Circle] and with the intention that the licensee exploit it." Weinstein Co. v. Smokewood Entm't Grp., LLC, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009) (quoting SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc., 211 F.3d 21, 25 (2d Cir. 2000)). Plaintiff knew as he recorded the album, with Magic Circle's studios and resources, that Magic Circle was to distribute the album. See, e.g., Dkt. No. 151-2 at 14–19 ("March 25 and April 7, 2012 Wagner Emails"). Thus, the absence of a written copyright assignment does not preclude an enforceable album contract.

In addition, Plaintiff argues that the parties' prior written agreements, including the 2007 Artist Agreement and NDA regarding HolyHell's first album, show that the parties would have reduced a similar album agreement to writing. Pl.'s Opp'n at 22–23. This is a fair point to make at trial. But in view of the parties' part performance, including the substantial sums Magic Circle invested in the project, their long history working closely together, and their extensive email and oral communications concerning the project, the jury could also conclude that the parties had worked together long enough that they viewed a more formal written agreement unnecessary.

Turning to the particulars, the jury could also conclude that Plaintiff agreed to produce a "full-length" album, Dkt. No. 151-3 at 240–49 ("Breon Affidavit") ¶ 10, and that the parties understood "full length" to mean more than four songs. First, HolyHell's earlier album with Magic Circle contained more than ten songs. See 2007 Artist Agreement at 5. Discussing

Darkness Visible at the December 2011 meeting, Breon anticipated that the band would record "three songs [per] week" in January 2012. See Dec. 22, 2011 Tr. at 7–9. Consistent with that understanding, Plaintiff produced "numerous" additional songs using Magic Circle's studios that "were not finished in the spring of 2012." Pl.'s RSMF ¶ 25 (citing Palomo Aff. ¶ 11). At the May 2012 meeting, Plaintiff and DeMaio indicated that they expected the album to have twelve songs. May 2012 Tr. at 26 (Plaintiff: "We're going to do the fucking thing, it's 12 songs, another song?"), 30 (Plaintiff: "Here, as of today's schedule, Round House needs music for one song, for one of the album, all 12, because the 12 here, the other 11 couldn't fit."). Later in the conversation, DeMaio states that HolyHell had "three songs done" and that "that's a quarter of the record," to which Plaintiff responded, "yeah, yeah." Id. at 64. Finally, Magic Circle's June 2012 Press Release stated that the June 2012 release included only "3 songs from the forthcoming longplay album" that would be "full of epic, power-goth metal." Dkt. No. 151-3 at 78 ("Press Release").[25] The jury could interpret these statements as aspirational—indicating that the parties hoped to complete six to twelve songs, but never had a solid agreement to do so. But it could also find that they agreed to produce an album of around ten songs.

As for the timeline, emails from Arruda indicate that the parties planned that "all songs" would be completed by May 1, Spring 2012 Emails at 8–12, and the Press Release indicates that the full album was originally slated for release in June 2012. Plaintiff asserts that even if HolyHell agreed to produce a ten-song album by May 2012, the parties modified that agreement during the May 2012 meeting. Pl.'s Opp'n at 23. He argues that DeMaio "told Mr. Palomo and Ms. Breon to focus [on] finaliz[ing] a small number of songs for mixing into an album that could be released in conjunction with [the] tour planned for the summer of 2012." Pl.'s SMF ¶ 32

---

[25] The Press Release is Exhibit 6 to Huffman's Affidavit.

(citing May 2012 Tr. at 24–25). For his part, DeMaio testified that he was only cleaning up HolyHell's mess—that at the May 2012 meeting, he "offered various solutions to the problems created by HolyHell failing to complete the Darkness Visible album." July 2018 DeMaio Aff. ¶ 9.

In any event, even if Magic Circle agreed to extend the time for HolyHell to complete the album, the jury could still find that Plaintiff breached the contract because he *never* delivered the full record. At the May 2012 meeting, the parties anticipated releasing the full physical album later, May 2012 Tr. at 17, 36–38, 80, and Magic Circle's Press Release indicated that HolyHell and Magic Circle would release the album in the fall of 2012, Press Release. While Plaintiff states that HolyHell "ended its relationship with Defendants in the summer of 2012," he does not assert that Magic Circle ever waived the band's obligation to produce the record. Pl.'s SMF ¶ 41.

Accordingly, there is a genuine dispute of fact whether Plaintiff entered an implied-in-fact contract with Magic Circle to produce an approximately ten-song album called Darkness Visible, use the resulting income to recoup Magic Circle's investment in the album, and split the profits with Magic Circle.[26]

### 2. *Failure to Return Company Property*

Defendants also allege that by failing to return electronic audio files containing songs recorded for use in the Darkness Visible album, Plaintiff breached the 2007–2010 written agreements. Plaintiff kept files of audio recordings, or "stems," recorded at Magic Circle for Darkness Visible in spring 2012. Pl.'s SMF ¶ 38 (citing Palomo Aff. ¶ 15 & Ex. 21). Defendants

---

[26] In their Amended Answer, Defendants claimed that Plaintiff also promised to help create cover art and a CD insert for the album, as well as a website. Am. Answer ¶ 187, 192. However, Defendants did not address Plaintiff's arguments that Defendants lack evidence to prove those contentions. Pl.'s Mem. at 25–26; Opp'n; Pl.'s Reply at 10. As such, Defendants have abandoned their theories based on the cover art, inserts, and the website.

assert that the contracts obliged Plaintiff to return the files he retained. They point out that the parties' past written agreements required him to return the company's physical property

> [u]pon termination of its services, irrespective of time, manner or cause of said termination; employee or independent contractor shall surrender to Magic Circle Music all lists, computer files, documents, books and records of or in connection with Magic Circle Music or its affiliates' businesses other property belonging to Magic Circle Music and its affiliates.

2010 NDA at 1 § b; see also 2007 NDA at 1 § b. The 2007–2010 agreements limited themselves to contemporaneous projects and did not purport to govern Darkness Visible or recordings in connection with it. See 2007 NDA at 1 ("Magic Circle Music by this Agreement, hereby engages the services of independent contractor through God of Thunder Productions Ltd. for the Demons, Dragon and Warriors production and worldwide touring services."); 2010 NDA at 1 ("Magic Circle Music by this Agreement, hereby engages the services of Independent Contractor for the 'Death to Infidels World Tour.'"). Defendants assert, however, that "[i]n keeping with [the] usual and ordinary terms" of the parties' approximately five-year business relationship, they understood that Plaintiff would return Magic Circle property once the Darkness Visible project concluded. Am. Answer ¶ 188.

"Where an agreement expires by its terms, and, without more, the parties continue to perform as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old." 22 N.Y. Jur. 2d Contracts § 224 (citations omitted). For example, in Watts v. Columbia Artists Management Inc., the court found a musician's managing agent was entitled to the 15% commission from plaintiff's revenue from his paid performances the agent helped set up even after their written contract expired. 591 N.Y.S.2d 234, 236 (N.Y. App. Div. 1992). In affirming, the Third Department reasoned that "the parties' conduct after the expiration of the written contract, including defendant's continued rendition of

services," and "plaintiff's acceptance of those services," "establish[ed] a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract between defendant and the Corporation." Id.

Even if the parties did not intend to adopt all the provisions of an old contract, "the parties' past practices may fill gaps in [the new] contract." New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 31 (2d Cir. 1997) ("Evidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms. . . . Specifically, terms repeated in a number of written confirmations may, over time, become part of later contracts."); Restatement (Second) of Contracts § 223(2) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.").

Applying these principles, a reasonable jury could conclude that the 2007 and 2010 NDAs evidence an ongoing understanding that if Plaintiff's relationship with Magic Circle terminated, he would return the "lists, books and records" of or in connection with Magic Circle . . . or other property of Magic Circle." 2010 NDA at 1 § b. See New Moon, 121 F.3d at 31. It could also conclude that by using Magic Circle funds, equipment, and personnel to produce and promote Darkness Visible, he perpetuated this commitment to the return company property. See Watts, 591 N.Y.S.2d at 236. Finally, it could conclude that the audio files created during HolyHell's recording sessions at Magic Circle were Magic Circle property.[27] See Stump Dep. at

_____

[27] Defendants also argue that "[p]ursuant to the written Artist Agreements," the Darkness Visible songs contained on the files were "works made-for-hire," to which Magic Circle owned the copyrights. Defs.' Opp'n at 27. However, copyright has nothing to do with whether Defendants own the files themselves. "Ownership of a copy is something distinct from copyright ownership. For example, the author of a book, or her assignee, ordinarily owns the copyright in the book and thus the sole right to authorize copying," but "each purchaser of a copy of the book owns that copy." Krause v. Titleserv, Inc., 402 F.3d 119, 122 (2d Cir. 2005) (citing 17 U.S.C. § 202). Thus, even if Magic Circle owned the copyrights to Darkness Visible songs, that would not entitle it to possess the recordings. See also Frasier v. Adams-Sandler, Inc., 94 F.3d 129, 130

36

111, 116 (stating his understanding that Magic Circle owned the recordings to Darkness Visible songs).[28]

### 3. Damages

Under New York law, to maintain their breach of contract claim, Defendants must also establish damages resulting from Plaintiff's breaches. Eternity Glob., 375 F.3d at 177. Defendants argue as follows:

> The next issue to be established it the amount of damages suffered by Magic Circle as a result of Plaintiff's breaches. Simply put, Magic Circle expended a substantial amount of costs towards the Darkness Visible album project which it is unable to recoup as a result of Plaintiff's (1) failure to complete and deliver the Darkness Visible album, and (2) theft of the Darkness Visible album recording files. As discussed above, Magic Circle invested $160,300.28 in unrecouped capital towards the Darkness Visible project.

Defs.' Mem. at 29 (citing Defs.' SMF ¶ 24). Later, they state that Plaintiff "received the benefit of taking substantial recording files from the project with him, so that he could complete the album and exploit it independent of Magic Circle." Id. at 30.

Thus, Defendants seek to recover their alleged $160,000.28 investment in the Darkness Visible project. They could do so on two theories. First, a party may recover "reliance damages" equal to "his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 729 (2d Cir. 1992). In addition, "[u]pon a demonstration that a defendant is liable for material breach, the plaintiff may recover" "restitution" equal to "the reasonable value of services

---

(4th Cir. 1996) (explaining that copyright in a photograph did not entitled the owner to possess the photograph); United States v. Smith, 686 F.2d 234, 240 (5th Cir. 1982) ("[O]wnership of a copyright does not encompass ownership of the words, sounds, pictures, or images embodied in the tangible object. In other words, a copyright is independent of both its physical manifestation and the very thing that is copyrighted.").

[28] Stump's Deposition is Exhibit 22 to Kelbanoff's Affidavit, Dkt. No. 177-1 at 838–1030.

rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him." Id.

However, not every minor breach entitles the other party to demand all its money back. "The injured party is limited to damages based on his actual loss caused by the breach." Restatement (Second) of Contracts § 347, cmt. e (1981). Accordingly, "Reliance damages are available only for efforts 'rendered useless' as a consequence of the breach." Summit Properties Int'l, LLC v. Ladies Prof'l Golf Ass-n, No. 07-CV-10407, 2010 WL 4983179, at *5 (S.D.N.Y. Dec. 6, 2010) (citation omitted). And "restitution [damages are] available only if the breach gives rise to a claim for damages for total breach"—also called "material breach"—"and not merely to a claim for damages for partial breach." Mazzei v. Money Store, 308 F.R.D. 92, 105 (S.D.N.Y. 2015). "A material breach is one that has been defined as one that would justify the other party to suspend his own performance of the contract." Lanvin Inc. v. Colonia, Inc., 739 F. Supp. 182, 195 (S.D.N.Y. 1990).

> Whether a failure to perform constitutes a "material breach" turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract. For a breach to be material, it must "go to the root of the agreement between the parties."

Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 136 (2d Cir. 2016) (citing Septembertide Publ'g, B.V. v. Stein & Day, Inc., 884 F.2d 675, 678 (2d Cir. 1989)

Since the album was the purpose of the alleged contract, Plaintiff's failure to deliver it would have been a material breach that "rendered useless" Defendants' expenditures to produce and market the album, Summit Properties, 2010 WL 4983179, at *5, and entitles Magic Circle to recover the reasonable value of the services it provided Plaintiff pursuant to the contract. Process Am., 839 F.3d at 136. Nonetheless, Plaintiff argues that "Defendants . . . have no admissible

evidence to support their purported $160,300.28 in expenditures towards Darkness Visible." Pl.'s Opp'n at 29–30. There is, however, evidence based on which a reasonable jury could find Magic Circle invested a substantial portion of that amount in Darkness Visible. DeMaio testified that Magic Circle paid Plaintiff $47,180.41 in 2012 and that "his primary task, at least through July 2010" was "to produc[e] the Darkness Visible album project and associated live performances." DeMaio Aff. ¶ 12); see also Pl.'s RSMF ¶ 22; Dkt. No. 151-2 at 27 ("Plaintiff's 2012 Form 1099"). Though Plaintiff may have "performed work unrelated to Darkness Visible for Defendants in 2012," he does not discuss what other work he did during that time. Pl.'s Opp'n at 29 (citing DeMaio Dep. at 439–44); Pl.'s RSMF ¶ 22. And substantial evidence confirms that Plaintiff spent a great deal of time in early 2012 recording songs for the album at Magic Circle's studios and meeting with Magic Circle management to discuss its progress. See, e.g. Palomo Aff. ¶¶ 12–14; May 2012 Tr.  In addition, as explained earlier, Magic Circle documented its other expenses associated with the album's production and promotion. HolyHell - Darkness Visible Project Fin. Summ.

Accordingly, a reasonable jury could (but need not) conclude that Plaintiff had a contract to complete the Darkness Visible album—a full-length album of around ten songs—that he breached that contract, and that Defendants are entitled to recover their investment. For that reason, Defendants' breach-of-contract counterclaim cannot be resolved before trial.

That said, Defendants do not provide evidence that Plaintiff's obligation to return audio files to Magic Circle was a material term of the contract, or that his alleged conversion cost the company anything. They do not explain how the return-of-property provision, if it applied, went to the "root" of the Darkness Visible contact. Process Am., 839 F.3d at 136. There is also no evidence that Plaintiff "exploit[ed]" the recordings for his own profit, as Defendants allege.

Defs.' Mem. at 30. Plaintiff and HolyHell's guitarist, Joseph Stump, testified that they re-recorded the Darkness Visible tracks and did not use the Magic Circle recordings. Pl.'s SMF ¶¶ 65–67; see also Palomo Dep. at 196; Stump Dep. at 110–111. Defendants do not contest this. Defs.' RSMF ¶¶ 65–67.[29] Although they alleged that Plaintiff produced a song called "Invictus," which he posted on Facebook, with company property, Am. Answer ¶¶ 129–33, 216, they identify no evidence supporting this contention.[30]

In denying Plaintiff's motion to dismiss, the Court said that Defendants could also prove damages if the "deprivation of company property . . . resulted in increased expenses" or "foregone revenue" for Magic Circle. Palomo, 2017 WL 6001825, at *5. "For instance, [Plaintiff] may have refused to return song recordings that [Magic Circle] could otherwise have sold and monetized." Id.; accord Summit Properties, 2010 WL 4983179, at *5 (stating that parties may recover reliance damages for contributions "rendered useless" by the breach). However, discovery revealed that Plaintiff did not take the only copies of the Darkness Visible recordings. Rather, Plaintiff gave unrebutted testimony that the originals—the "master sessions" of the Darkness Visible recordings—remain in Defendants' possession. Palomo Dep. at 219; DeMaio Dep. at 321–22 (admitting that Plaintiff "left" with Magic Circle audio files, which "reside on [Magic Circle's] hard drive," that are "identical" to the copies Plaintiff took); Wagner Dep. at 281–82.

---

[29] Defendants contend that Plaintiff manipulated the stems to make them sound different, and to "conceal the fact that he had stolen work product from Magic Circle," but admit that Plaintiff later re-recorded the songs. Defs.' Opp'n at 28.

[30] The fact that "Palomo and/or his band, HolyHell" in 2014 "represented [Invictus] as a 'bonus track taken off HolyHell's forthcoming album 'Darkness Visible'" and a "piece [they] recently revisited since working on it several years back"—a quotation for which Defendants have provided no citation—could not be construed to contradict Plaintiff's contention that he rerecorded the Darkness Visible songs without using Magic Circle's files.

Accordingly, Defendants' breach-of-contract claim survives based on Plaintiff's failure to produce Darkness Visible. However, they cannot recover based on Plaintiff's retention of audio files from the 2012 recording sessions, as they cannot show the alleged theft damaged them.

## B. Unjust Enrichment

"A claimant seeking relief under a theory of unjust enrichment in New York must demonstrate '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" Leibowitz, 584 F.3d at 509 (quoting In re Mid–Island Hosp., Inc., 276 F.3d 123, 129 (2d Cir.2002)). Defendants allege that by failing to complete Darkness Visible and by misappropriating Magic Circle's audio files—which they allege that Plaintiff exploited to produce new music he published online—Plaintiff wrongly retained "the benefits of Magic Circle's investment" in the Darkness Visible project, "with Magic Circle having no means to recoup" the money. Defs.' Opp'n at 25 (citing Am. Answer ¶ 229). The Court previously concluded that these allegations plausibly alleged a claim for unjust enrichment. Palomo, , 2017 WL 6001825, at *7. In addition, Plaintiff now appears to concede that Defendants unjust enrichment claim has a second basis: "that [Plaintiff] benefitted at their expense by receiving a salary and because Magic Circle expended 'some $160,300.28' on Darkness Visible." Pl.'s Opp'n at 29. However, Plaintiff now makes three argument that the claim should be dismissed.

### 1. Timeliness

First, Plaintiff argues that the claim is time-barred. Under New York law, unjust Enrichment claims seeking damages are subject to a three-year statute of limitation, which "begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution." See Ingrami v. Rovner, 847 N.Y.S.2d 132, 134 (App. Div. 2007). Plaintiff argues that here, the three-

year clock began to run in March 2013—when Defendants allege Plaintiff misappropriated Magic Circle's property—at the latest. Pl.'s Mem. at 21–22. Defendants filed their unjust enrichment claim on February 13, 2017, more than three years later. Nevertheless, Defendants argue that Plaintiff tolled the limitations period when he filed this case on December 28, 2015. Defs.' Opp'n at 29 (citing <u>Aramony v. United Way of Am.</u>, 969 F. Supp. 226, 231 (S.D.N.Y. 1997 ("Under Fed. R. Civ. P. 13, a counterclaim tolls its limitations period at the filing of the initial complaint if it is compulsory.")); 6 Fed. Prac. & Proc. Civ. § 1419 ("Although there is some conflict on the subject, the majority view appears to be that the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim."). Plaintiff counters that Defendants' counterclaim is permissive, not compulsory.

The parties appear to have overlooked that to determine whether a state law claim is timely—without a federal rule on point—the Second Circuit uses "the law of the relevant state, including state tolling rules." <u>Wilchfort v. Knight</u>, 307 F. Supp. 3d 64, 81 (E.D.N.Y. 2018) (citing <u>Casey v. Merck & Co.</u>, 653 F.3d 95, 100 (2d Cir. 2011)). "The text of Rule 13(a) itself does not offer any solution to the problem of whether the institution of an action tolls the running of the limitations period on compulsory counterclaims or reflect any policy on the question;" therefore "the issue . . . will be determined by reference to state law . . . in diversity actions." <u>Peekskill City Sch. Dist. v. Colonial Sur. Co.</u>, 6 F. Supp. 3d 372, 377 (S.D.N.Y. 2014), <u>aff'd</u>, 595 F. App'x 91 (2d Cir. 2015) (quoting 6 Fed. Prac. & Proc. Civ. § 1419 (3d ed. updated 2013)). Section 203(d) of the New York Civil Practice Law and Rules states that "[a] defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed." Plaintiff filed his Complaint on December 28, 2015. Therefore, Defendants' unjust enrichment claim, accruing in March 2013, was not time-barred.

### 2. Preemption

Plaintiff also argues that the Copyright Act preempts Defendants' unjust enrichment claim based on his misappropriation of the audio files from HolyHell's Darkness Visible recording sessions at Magic Circle. Pl.'s Mem. at 23–25.

> The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106.

Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004) (citing 17 U.S.C. § 102(a)). The first, "subject matter" requirement "is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works," such as sound recordings. Id.; 17 U.S.C. §102(a)(7). Under the second, "general scope" requirement, "the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." Briarpatch, 373 F.3d at 305. Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." Harper & Row Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 (1985).

> To determine whether a claim is qualitatively different, we look at "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." Moreover, we take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim. Awareness or intent, for instance, are not extra elements that make a state law claim qualitatively different. On the other hand, a state law claim is qualitatively different if it requires such elements as breach of fiduciary duty, or possession and control of chattels.

Briarpatch, 373 F.3d at 306 (citation omitted) (holding claim that defendants adapted novel into motion picture without compensating copyright holders was preempted). The requirement that a

defendant have been "enriched" by the misappropriation of a copyrighted work is not enough to distinguish an unjust enrichment claim from copyright infringement. Id.

In Harper & Row, the plaintiffs had a similar claim to Defendants: "they propound[ed] a theory which rests the tort upon the unlawful possession of the physical property of [a] manuscript"—just as Defendants based their claim on Plaintiff's allegedly unlawful possession of audio recordings. 723 F.2d at 201. The Second Circuit found that "[i]n doing so, they have placed themselves neatly upon the horns of a dilemma"; "if unauthorized publication is the gravamen of their claim, then it is clear that the right they seek to protect is coextensive with an exclusive right already safeguarded by the Act—namely, control over reproduction and derivative use of copyrighted material." Id. Likewise, if Defendants intend to base their claim on Plaintiff's copying, derivative use, or distribution of the Darkness Visible recordings, their claim is preempted. Id.; see also Palomo, 2017 WL 6001825, at *10 (holding that Defendants' unfair competition claim based on Plaintiff's commercial exploitation of the recordings was preempted).

A claim based on Plaintiff's unlawful "possession and control of chattels"—the files themselves—might not be preempted. Harper & Row, 723 F.2d at 201. However, as explained earlier, Defendants present no evidence that Plaintiff reaped any benefit from keeping the stem files (other than, perhaps, reproducing and distributing the copyrighted music they contained). Therefore, Defendants cannot maintain an unjust enrichment claim based on those stem files. See Am. Movie Classics Co. v. Turner Entm't Co., 922 F. Supp. 926, 934 (S.D.N.Y. 1996) (preempting unjust enrichment claim that did "not allege that [the] defendants were enriched from anything other than their unauthorized exhibition of the copyrighted films").

### 3. *Lack of Benefit*

Defendants can, however, maintain their unjust enrichment claims based on Plaintiff's failure to produce the Darkness Visible album as Defendants justifiably expected. Plaintiff argues that Defendants have not demonstrated a benefit to Plaintiff at their expense. Pl.'s Opp'n at 28. However, as explained earlier, a reasonable jury could find that Plaintiff got benefits—use of Magic Circle's studios, equipment, personnel, and money to produce and promote his album, as well as his 2012 compensation of $47,180.41—without delivering the album Magic Circle reasonably expected him to produce. See Palomo, 2017 WL 6001825, at *7 (explaining that a party may maintain unjust enrichment and breach of contract claims based on the same subject matter if "there is a bona fide dispute as to the existence of [an applicable] contract," even though the party "may not ultimately recover on both the breach of contract and unjust enrichment claims") (citations omitted).  As there is a genuine dispute of material fact concerning whether Plaintiff contracted with Magic Circle to produce Darkness Visible and whether he was unjustly enriched, both the breach-of-contract and unjust enrichment counterclaims based on the Darkness Visible project survive summary judgment.

## VI.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 151) is **GRANTED** with respect to Plaintiff's claim for tortious interference with prospective economic advantage and otherwise **DENIED**; and it is further

**ORDERED**, that Plaintiff's Motion for Summary Judgment (Dkt. No. 152) is **GRANTED** in part and **DENIED** in part as follows. Defendants are liable for conversion, and Plaintiff is entitled to replevin of his music equipment held by Defendants. In addition, Plaintiff

is not liable for breach of contract, and was not unjustly enriched, by retaining any Magic Circle company property. However, there are genuine dispute of material fact concerning: (1) Plaintiff's damages for the conversion; (2) whether Plaintiff breached a contract by failing to produce the Darkness Visible album for Magic Circle; (3) whether Plaintiff was unjustly enriched by receiving compensation from Magic Circle, as well as the use of Magic Circle studios and resources, to produce the unfinished album.

**IT IS SO ORDERED.**

DATED:     September  04 , 2019
            Albany, New York

Lawrence E. Kahn
U.S. District Judge