UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SERGIO FRANCISCO PUEBLA PALOMO,

Plaintiff,

-against- 5:15-CV-1536 (LEK/TWD)

JOSEPH G. DEMAIO, *et al.*,

Defendants.

---

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Plaintiff Sergio Francisco Puebla Palomo, a musician, composer, and recording artist, brought this action against his former production company, Magic Circle Music, and its owner Joey DeMaio alleging conversion of his music equipment, replevin, and tortious interference with various other business relationships. Dkt. No. 1 ("Complaint") ¶ 4. Defendants counterclaimed for breach of contract and unjust enrichment. Dkt. No. 39 ("Amended Answer") ¶¶ 144–230. Both sides moved for summary judgment. Dkt. Nos. 151 ("Defendants' Motion for Summary Judgment"), 152 ("Plaintiff's Motion for Summary Judgment"). By Memorandum-Decision and Order entered on September 4, 2019, this Court granted Defendants' Motion for Summary Judgment with respect to Plaintiff's claim of tortious interference and denied it for all other causes of action. Dkt. No. 181 ("September 2019 Memorandum-Decision and Order"). In the same order, the Court granted Plaintiff's Motion for Summary Judgment on his claims of conversion and replevin and for a portion of Defendants' counterclaims of breach of contract and unjust enrichment. Id.

Presently before the Court is Defendants' motion seeking reconsideration of the September 2019 Memorandum-Decision and Order. Dkt. No. 182 ("Motion for Reconsideration"). For the reasons that follow, Defendants' Motion is denied.

## II. BACKGROUND

### A. Factual Background

Plaintiff's factual allegations are detailed in the September 2019 Memorandum-Decision and Order, familiarity with which is assumed. See Sept. 2019 Mem.-Decision and Order at 3–10. For convenience, the Court briefly summarizes the relevant facts here. The following facts are undisputed unless otherwise noted.

From 2005 to April 2013, Plaintiff served as a music director and composer for Magic Circle. Dkt. No. 151-1 ("Defendants' Statement of Material Facts") ¶ 3; Dkt. No. 166 ("Plaintiff's Response Statement of Material Facts") ¶ 3. Plaintiff also played keyboard for HolyHell, a heavy metal band led by his wife, Mary Ellen Breon. Compl. ¶ 22; Am. Answer ¶ 22. From 2007 until at least 2010, Plaintiff and HolyHell entered into a series of written agreements with Magic Circle to produce at least one album and perform on live tours, among other things. See Dkt. No. 39 at 36–41, 42–44, 45–49, 50–54, 55–57 ("2007-2010 Written Agreements").[1] The 2007-2010 Written Agreements addressed copyright ownerships, compensation, and other terms of the parties' collaboration on HolyHell's first album, concerts, and tours. Id.

On December 22, 2011, Plaintiff and Breon met with Magic Circle management, including DeMaio, to discuss preparations for HolyHell's second full-length album, later titled

---

[1] Citations to filings refer to the page numbers generated by CM/ECF, the Court's electronic filing system.

Darkness Visible. Defs.' SMF ¶ 8; Pl.'s RSMF ¶ 8. During the meeting, the parties reviewed Magic Circle's proposed budget for the album and associated touring, which was detailed in a spreadsheet indicating projected costs and revenues. Defs.' SMF ¶ 11; Pl.'s RSMF ¶ 11. The spreadsheet noted that Magic Circle and HolyHell would split the profits for Darkness Visible 50-50. Dkt. No. 153-2, Ex. 10. At the end of the meeting, Breon remarked that the spreadsheet was "overwhelming," and that she needed "to take a hot bath to think about it." Dkt. No. 153-2, Ex. 9-T.

Defendants assert that during the December 22, 2011 meeting, Plaintiff and HolyHell agreed to produce Darkness Visible with a minimum of 10 newly written songs, to be completed no later than May 2012. Defs.' SMF ¶ 18. Plaintiff disputes that the parties had any contract regarding Darkness Visible, let alone a settled number of songs or deadline. Pl.'s RSMF ¶ 18.

Nevertheless, in early 2012, HolyHell proceeded with Darkness Visible using Magic Circle's recording studios and financial support. Id. ¶ 16; Defs.' SMF ¶ 16. In May 2012, Plaintiff and Breon met with Magic Circle management, and there was a consensus that album production for Darkness Visible was behind schedule, with HolyHell having only recorded four songs by that point Dkt. No. 153-2, Ex. 19-T at 6–7, 13–15, 24–25. Upon DeMaio's suggestion, HolyHell released three of their four finished songs digitally before their upcoming summer tour with the expectation that the parties would release the full album in the fall of 2012. Id. at 17, 36–38, 80.

HolyHell went on tour in Europe in June and July of 2012, and Plaintiff authorized Magic Circle to ship his musical equipment to Europe through Rock-it Cargo, a third-party shipper. Dkt. No. 153 ("Plaintiff's Statement of Material Facts") ¶¶ 42–43; Dkt. No. 167 ("Defendants'

Response Statement of Material Facts") ¶¶ 42–43. When the tour ended, Defendants stored Plaintiff's equipment in a German warehouse. Dkt. No. 167-1 ("July 2018 DeMaio Affidavit") ¶ 18. Due to "irreconcilable conflicts," Holyhell decided to stop working with Magic Circle after the tour. Pl.'s SMF ¶ 40; Defs.' RSMF ¶ 40. Plaintiff, however, continued to work with Magic Circle as a music director and composer until March 2013. Pl.'s SMF ¶ 41; Defs.' RSMF ¶ 41. In fall 2012, Plaintiff asked Defendants if Plaintiff's friends could retrieve his music equipment from the German warehouse before it was shipped back to the United States. Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47. Magic Circle responded, saying that it had used a customs permit called a "Carnet" to ship Plaintiff's equipment to Europe and that in order to avoid paying import-export duties for the equipment, Rock-it Cargo needed to ship the equipment back to the United States. Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47. DeMaio added that Plaintiff "would be able to retrieve the equipment when it was returned to the United States." Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47.

The equipment was shipped back to the United States in spring 2013. Pl.'s SMF ¶ 48; Defs.' RSMF ¶ 48. While the equipment was in transit, Plaintiff's visa application was denied and he was forced to return to Mexico, his native country. Pl.'s SMF ¶ 49. Upon learning that his equipment had arrived in the United States, Plaintiff made several e-mail requests for retrieval. Pl.'s SMF ¶ 51; Defs.' RSMF ¶ 51. DeMaio responded by asking Plaintiff to sign releases concerning the end of his professional relationship with Magic Circle that included a release of any legal claims Plaintiff had against Magic Circle and an agreement to assign the rights of Plaintiff's work product to Magic Circle. Pl.'s SMF ¶ 52; Defs.' RSMF ¶ 52. Plaintiff refused to sign the releases. Pl.'s SMF ¶ 55; Defs.' RSMF ¶ 55. On May 16, 2013, Plaintiff's counsel wrote a letter to Magic Circle and requested the return of Plaintiff's equipment without any conditions.

Dkt. No. 153-1 at 100–101. Magic Circle refused and said that Plaintiff "had to sign the General Release Agreement to provide for the orderly transfer . . . of Mr. Palomo's property." Id. at 110.

After leaving Magic Circle in spring 2013, Plaintiff retained computer files containing audio recordings, called "stems," from HolyHell's spring 2013 recording session at Magic Circle. Pl.'s SMF ¶ 38. HolyHell never finished Darkness Visible but did independently release the work "they had begun in 2012 leading up to the summer 2012 tour," along with a few new songs on their Facebook page in 2014. Pl.'s SMF ¶¶ 65–67; Defs.' RSMF ¶¶ 65–67. In a separate case before the New York State Supreme Court, the parties dispute who owns the copyrights to these recordings. Defs.' RSMF ¶ 69.

**B. Procedural History**

Plaintiff filed the Complaint on December 28, 2015, asserting claims for conversion, trespass to chattels, replevin, and interference with prospective economic advantage. Compl. In April 2017, Defendants counterclaimed for breach of contract and unjust enrichment based on Plaintiff's: (1) retention of company property and (2) receipt of compensation from Magic Circle. Am. Answer ¶¶ 144–230. The Court subsequently dismissed Plaintiff's trespass to chattels claim. Dkt. No. 21. After discovery concluded, the Court ruled on cross-motions for summary judgment in its September 2019 Memorandum-Decision and Order.

**C. September 2019 Memorandum-Decision and Order**

The Court granted Defendants' Motion for Summary Judgment on Plaintiff's claim of tortious interference and denied it for all other counts. See Sept. 2019 Mem.-Decision and Order at 45–46. It also granted Plaintiff's Motion for Summary Judgment on his claims of conversion and replevin and for Defendants' counterclaims of breach of contract and unjust enrichment. Id.

The Court found a genuine dispute of material fact concerning: (1) Plaintiff's damages for the conversion, (2) whether Plaintiff breached a contract by failing to produce the Darkness Visible album for Magic circle, and (3) whether Plaintiff was unjustly enriched by receiving compensation from Magic Circle and using Magic Circle studios and resources to produce the unfinished album. Id.

For the claims of conversion and replevin, the Court first held that Plaintiff's conversion and replevin claims were not time-barred under New York's three-year statute of limitations. Id. at 10; see also N.Y.C.P.L.R. §§ 203(a), 214(3). At issue was the date on which the claims accrued. Defendants contended that the claims accrued in summer 2012 when they took possession and transported Plaintiff's equipment to Europe. Sept. 2019 Mem.-Decision and Order at 10–11; Defs.' Mem. at 10. However, Plaintiff argued, and the Court agreed, that the claims accrued when Defendants refused to return his equipment unless he signed their release in spring 2013, because this was when Defendants alerted Plaintiff that they intended to commandeer his equipment. Sept. 2019 Mem.-Decision and Order at 10–11 (citing Hoelzer v. City of Stamford, Conn., 933 F.2d 1131, 1133 (2d Cir. 1991) (holding that an art restorer did not convert the owner's paintings by merely acquiring them from a third party and holding them for storage and restoration) (internal quotation marks omitted). The Court went on to hold Defendants liable for conversion since it was undisputed that Defendants had possession of Plaintiff's equipment since 2012 and did not return his equipment despite Plaintiff's multiple requests. Id. at 17. The Court then said that because Plaintiff had proved conversion, he was entitled to replevin as a matter of law but that the precise amount of damages needed to be determined at trial. Id. at 24.

For the Defendants' breach of contract claim based on Plaintiff's retention of audio recordings, the Court held that although Plaintiff did keep the files of audio recordings that were recorded at Magic Circle, Defendants retained the master files of these recordings and could not show that Plaintiff's alleged theft damaged them. Id. at 40–41. The Court added that, although Defendants alleged that this theft of the Darkness Visible recordings breached the 2007-2010 Written Agreements, these agreements limited themselves to contemporaneous projects and did not govern Darkness Visible recordings. Id. at 34–35. Whether the parties mutually assented to an extension of their agreements was a question for a jury. Id. at 36–37. On contractual damages, the Court held that there was no evidence suggesting that Plaintiff's conversion of the audio files damaged Defendants and no evidence that Plaintiff exploited these recordings for his own profit. Id. at 39–40.

**D. Defendants' Motion for Reconsideration**

Defendants argue that Plaintiff's claims for conversion and replevin are barred by the statute of limitations. Mot. for Recons. at 4. Defendants point to e-mails from Plaintiff during November and December of 2012 in which he acknowledged that Defendants were withholding his equipment and stated that he was preparing to sue Defendants. Id. at 6. Defendants point to one such e-mail between Plaintiff and HolyHell members in which Plaintiff said that "another lawsuit [I'll] start once my green card process is done, unless the whole separation thing get's [sic] fixed, is against MCM for holding my equipment in Europe." Id. (quoting Dkt. No. 151-3, Ex. 8). Defendants claim that e-mails similar to this demonstrate that Plaintiff was aware of the basis of his claims more than three years before he filed suit, and these claims are therefore barred by the statute of limitations. Id. at 7.

Defendants also argue that the Court "overlooked evidence demonstrating that work product and/or materials falling under the 2007 and/or other written agreements later became part of the Darkness Visible project, and as such, Magic Circle is the owner of such work product and materials." Id. at 4. For this reason, Defendants argue, the Court should grant Defendants' motion for summary judgment with respect to its counterclaim for breach of contract over the return of the Darkness Visible work product and materials. Id. at 5.

Defendants also argue that because work product falling under the 2007-2010 Written Agreements was later incorporated into Darkness Visible, the Court should grant summary judgment on their counterclaim of breach of contract. Id. at 10.

**E. Plaintiff's Response**

Plaintiff responds that under the rigorous standard for evaluating a motion for reconsideration, neither of the Court's holdings should be altered. Dkt. No. 184 ("Plaintiff's Response") at 5.

Regarding whether the statute of limitations bars Plaintiff's claims for conversion and replevin, Plaintiff argues his awareness of the bases for his claims does not matter, and the critical inquiry is when Plaintiff was alerted that Defendants commandeered his equipment. Id. at 8–9.

Plaintiff points out that Defendants' breach of contract counterclaim was dismissed because Defendants failed to show evidence of damages. Id. at 10. Plaintiff adds that Defendants' Motion does not mention damages nor point to evidence demonstrating how Defendants were harmed by Plaintiff's failure to return the recordings. Lastly, Plaintiff asserts that the Court found that the plain language of the written agreements only governed the first HolyHell album, and if

Defendants argue that Plaintiff used the stem recordings from the first album in Darkness Visible, this argument should be rejected because Defendants did not assert it in their summary judgment motion. Id at 12 (citing Harris v. Subcontracting Concepts, LLC, No. 1:12-mc-82, 2013 WL 951336 (N.D.N.Y. Mar. 11, 2013) (explaining that a motion for reconsideration is not an opportunity for a losing party to advance new arguments to supplant those that failed in prior briefing)).

## III. STANDARD OF REVIEW

### A. Motion for Reconsideration

A court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice. Delaney v. Selsky, 899 F. Supp. 923, 925 (N.D.N.Y. 1995) (citing Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782, 789 (2d Cir. 1983)). The standard for granting a motion for reconsideration is strict. Shrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." Id.[2] Thus, a motion for reconsideration is not to be used for "presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998).

[2] Generally, motions for reconsideration are not granted unless "the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Id.

## IV. DISCUSSION

### A. Statute of Limitations

Defendants suggest that the Court overlooked evidence which supports a conclusion contrary to what the Court reached in its September 2019 Memorandum-Decision and Order. The Court disagrees.

Defendants argue that the Court "declined to address the numerous admissions by Plaintiff . . . during the months of November and December of 2012 in which he acknowledged that Defendants were withholding his equipment and that he was preparing to sue Magic Circle at that time." Mot. for Recons. at 6. As previously noted, Defendants point to one such e-mail between Plaintiff and HolyHell members in which Plaintiff said that "another lawsuit [I'll] start once my green card process is done, unless the whole separation thing get's [sic] fixed, is against MCM for holding my equipment in Europe." Id. (quoting Dkt. No. 151-3, Ex. 8). In addition, Defendants point to correspondence in late 2012 in which Plaintiff told his bandmates "in the case of my equipment I'll deal with it myself" and a letter to a benefactor in which Plaintiff expressed "several unsettling issues," including Defendants "withholding . . . the HolyHell touring equipment in Europe belonging to each of [them]." Id. at 6–7. Lastly, Plaintiff provided a list of equipment that was in Europe to DeMaio in December 2012. Id.

As the Court discussed in its September 2019 Memorandum-Decision and Order, "to convert property, the defendant must do more than simply possess it." Sept. 2019 Mem-Decision and Order at 11 (citing State v, Seventh Regiment Fund, Inc., 774 N.E.2d 702, 710 (N.Y. 2002) ("A defendant who, though having custody of goods, does not exclude the owner from the

exercise of his rights is not liable for conversion.”)). The tort requires the defendant to take an “affirmative act” evincing an intent to take the property as his own:

> While it is not necessary for a defendant to take or destroy goods to constitute a conversion, it is also not sufficient for a defendant secretly to declare ownership, when that declaration does nothing to inform the owner or any other interested party that an interference with ownership is intended. Some affirmative act—asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion.

Id. at 710–11.

A conversion claim accrues not from the time of the alleged conversion, but “rather from the time the true owner makes [a] demand for return of the chattel and the person in possession of the chattel refuses to return it.” Marchig v. Christie’s Inc., 439 F. App’x 22, 25 (2d Cir. 2011) (summary order). “When a defendant’s possession of the property was initially lawful, there is no conversion unless the defendant refuses the owner’s demand to return the property or wrongfully transfers or disposes of it before a demand is made.” Regions Bank v. Wieder & Mastroianni, P.C., 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007), aff’d, 268 F. App’x 17 (2d Cir. 2008).

In the September 2019 Memorandum-Decision and Order, the Court held that “Defendants did nothing ‘that might have alerted’ anyone that they intended to commandeer Plaintiff’s equipment while they stored it for him in 2012.” Sept. 2019 Mem.-Decision and Order at 13 (citing Hoelzer, 933 F.2d at 1133 (holding that an art restorer did not convert the owner’s paintings by merely acquiring them from a third party and holding them for storage and restoration)). Plaintiff initially authorized Defendants to take custody of the property in order to ship it to Europe for the tour. Id. Upon Plaintiff’s inquiry about whether his friend could retrieve

the equipment in Europe, DeMaio informed him that releasing the equipment in Europe was "impossible" under the terms of the Carnet but assured Plaintiff that he "would be able to retrieve the equipment when it was returned to the United States." Pl.'s SMF ¶ 47; Defs.' RSMF ¶ 47; Sept. 2019 Mem.-Decision and Order at 14. Because Defendants apparently did not have the ability to return the equipment while it was subject to the Carnet, this could not be the point when conversion occurred. Sept. 2019 Mem.-Decision and Order at 14 (citing Regions Bank, 526 F. Supp. 2d at 416 (explaining that where an owner authorized defendant to distribute property to a third party, defendant's "inability" to retrieve the property for return on demand was not conversion)). Once the equipment returned to the United States in 2013, Defendants had the ability to return the equipment to Plaintiff and chose to instead "alert" Plaintiff that they intended to commandeer it. Id. Thus, conversion occurred in 2013. Id.

Although Defendants highlight Plaintiff's correspondence that indicates he was contemplating an eventual lawsuit, this is not factored into the accrual analysis for conversion, and Defendants point to no case law suggesting otherwise. Plaintiff still apparently believed his equipment might be returned since he qualified one of the above e-mails with "unless the whole separation thing get's [sic] fixed . . .," indicating that Defendants had not yet alerted him or anyone else that they intended to commandeer the equipment while it was in Europe. Because Defendants do not point to any clear error in the Court's statute of limitations analysis, and because the evidence they suggest the Court overlooked is not relevant to state of limitations analysis, the Court denies Defendants' Motion requesting that the Court reconsider this portion of its September 2019 Memorandum-Decision and Order.

**B. Breach of Contract**

Defendants suggest that the Court overlooked evidence which supports a conclusion contrary to what the Court reached in its September 2019 Memorandum-Decision and Order. The Court disagrees.

Defendants argue that Darkness Visible recordings were covered in the 2007-2010 Written Agreements because work product and/or materials falling under the 2007-2010 Written Agreements later became part of the Darkness Visible album. Defendants appear to assert that the audio recordings that Plaintiff kept and incorporated into Darkness Visible were also used for the first HolyHell album covered by the 2007-2010 Written Agreements. Alternatively, Defendants seem to assert that Darkness Visible recordings fall under the purview of the 2007-2010 Written Agreements because they were derivative works of the recordings in HolyHell's first album.

In its September 2019 Memorandum-Decision and Order, the Court dismissed the breach of contract claim with respect to the parties' second agreement that was supposed to govern Darkness Visible, because Defendants could not establish damages resulting from Plaintiff's alleged theft of recordings. Sept. 2019 Mem.-Decision and Order at 41. On the issue of breach of the prior agreements, the Court stated that the "2007-2010 agreements limited themselves to contemporaneous projects and did not purport to govern Darkness Visible or recordings in connection with it." Id. at 35.

In the event that the recordings Plaintiff kept were related to HolyHell's first album and governed by the 2007-2010 Written Agreements, Defendants similarly do not establish any damages resulting from Plaintiff's alleged theft. Under New York law, to maintain a breach of

contract claim, Defendants must establish damages resulting from Plaintiff's breach. See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004). Plaintiff and HolyHell's guitarist testified that they re-recorded the Darkness Visible tracks and did not use Magic Circle recordings. Pl.'s SMF ¶¶ 65–67. Defendants do not contest this. Defs.' RSMF ¶¶ 65–67. In addition, the "master sessions" of the recordings that Plaintiff took still remain in Defendants' possession. Sept. 2019 Mem.-Decision and Order at 40. For these reasons, the Court held that Defendants "cannot recover based on Plaintiff's retention of audio files from the 2012 recording sessions, as they cannot show the alleged theft damages them." Sept. 2019 Mem.-Decision and Order at 41. For the same reasons, even if this work product fell under the 2007-2010 Written Agreements, Defendants still point to no damages.

To the extent that Defendants argue that the Darkness Visible contains derivative works from HolyHell's first album, this argument is preempted by the Copyright Act:

> The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106.

Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004) (citing 17 U.S.C. § 102(a)). The Second Circuit has held that "control over reproduction and derivative use of copyrighted material" is "safeguarded by the [Copyright] Act." Harper & Roe Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 (1985); see also Sept. 2019 Mem.-Decision and Order at 43–44.

Evidence that is "irrelevant to the ultimate outcome" is not a proper basis for reconsideration. See Latimore v. NBC Universal, Inc., 489 F. App'x 521, 521 (2d Cir. 2013). Because the result of Court's decision does not change if the stolen audio recordings fall under the purview of the 2007-2010 Written Agreements, the Court declines to reconsider this portion of its September 2019 Memorandum-Decision and Order.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Reconsideration (Dkt. No. 182) is **DENIED**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Memorandum-Decision and Order on Plaintiff.

**IT IS SO ORDERED.**[3]

DATED: November 23, 2020
Albany, New York

Lawrence E. Kahn
U.S. District Judge

[3] Due to the delays and disruptions caused by the COVID-19 pandemic, some cases/motions were not disposed of prior to the end of the reporting period.